IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| SYNGENTA SEEDS, INC; SYNGENTA HAWAI`I, LLC; PIONEER HI-BRED INTERNATIONAL, INC., an Iowan corporation; and AGRIGENETICS, INC., a Delaware corporation; BASF PLANT SCIENCE LP, a Delaware limited partnership,<br><br>        Plaintiffs,<br><br>    vs.<br><br>COUNTY OF KAUA`I,<br><br>        Defendant. | Case No. 1:14-cv-00014 BMK<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OF CLAIMS ONE, THREE, FOUR, AND FIVE OF FIRST AMENDED COMPLAINT** |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................i

TABLE OF AUTHORITIES................................................................iii

I.     INTRODUCTION ................................................................... 1

II.    BACKGROUND FACTS ......................................................... 2

     A.     Growers' Production of GMO on Kaua`i ......................... 2

     B.     Growers' Application of Pesticides on Kaua'i.................. 4

     C.     The Prevalence of GM Crops........................................... 5

     D.     The Provisions of Bill 2491 ............................................. 6

     E.     The County Council Testimony in Enacting Bill 2491..... 8

III.   SUMMARY JUDGMENT STANDARD.................................... 10

IV.    ARGUMENT ...................................................................... 10

     A.     Under the Hawai`i Constitution, The County Had No
           Authority to Enact Bill 2491 ........................................ 10

     B.     State Statutory Law Preempts Bill 2491 ....................... 15

          1.     The Hawai`i Pesticides Law Preempts the Pesticide
                Provisions of Bill 2491 ........................................ 16

          2.     State Statutory Law Preempts the GMO Provisions
                of Bill 2491 ........................................................ 25

          3.     H.R.S. § 46-17 Does Not Allow the County to Enact
                Bill 2491 ............................................................ 30

C.   Federal Law Preempts Bill 2491 ................................... 32

    1.   Federal Law Preempts Bill 2941's Mandatory Public Disclosure of Restricted Use Pesticide Application Data.................................................................. 33

    2.   Federal Law Preempts Bill 2491's Attempt To Regulate GMOs In Field Trials............................. 36

D.   Bill 2491 Violates The Equal Protection and Due Process Clauses of The Federal And State Constitutions .............................................................. 39

V.   CONCLUSION .................................................................... 47

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                    <u>**PAGE NO.**</u>

*Brown v. Hotel & Rest. Employees & Bartenders Int'l Union Local 54,*
468 U.S. 491 (1984) ................................................................. 38

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................ 10

*Citizens Utilities Co. v. County of Kaua`i,*
72 Hawai`i 285, 814 P.2d 398 (1991).................................... 16, 19

*City & County of Honolulu v. Ariyoshi,*
67 Haw. 412, 689 P.2d 757, 763 (1984) .................................... 11

*City of Cleburne v. Cleburne Living Center,*
473 U.S. 432 (1985) ........................................................... 39, 40

*City of New York v. FCC*, 486 U.S. 57 (1988)................................. 39

*County of Kaua`i v. Baptiste,*
115 Hawai`i 15, 165 P.3d 916 (2007).......................................... 11

*HGEA v. County of Maui*, 59 Haw. 65, 576 P.2d 1029 (1978) ........ 11

*In re Application of Anamizu,*
52 Haw. 550, 481 P.2d 116 (1971) ....................................... 16, 19

*John Doe #1 v. Veneman*, 380 F.3d 807 (5th Cir. 2004) ................ 35

*Kunimoto v. Kawakami*, 56 Haw. 582, 545 P.2d 684 (1976) .......... 20

*Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580 (9th Cir. 2008) .......... 40

*Lingle v. Chevron Corp.*, 544 U.S. 528 (2005) ................................ 40

*Lockary v. Kayfetz*, 917 F.2d 1150 (9th Cir. 1990)......................... 42

*Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013) .................. 32

*Plyler v. Doe*, 457 U.S. 202 (182) ................................................... 40

*Posters 'N Things, Ltd. v. United States*, 511 U.S. 513 (1994) ........ 44

*Richardson v. City & County of Honolulu*,
   76 Hawai`i 46, 868 P.2d 1193 (1994)........................ 10, 15, 25, 30

*Romer v. Evans*, 517 U.S. 620 (1996)............................................. 40

*Sierra Club v. Department of Transportation*,
   120 Hawai`i 181, 202 P.3d 1226 (2009)....................................... 41

*Silva v. City & County of Honolulu*,
   115 Hawai`i 1, 165 P.3d 247 (2007)............................................. 41

*State v. Ewing*, 81 Hawai`i 156, 914 P.2d 549 (App. 1996)............ 16

*State v. Sturch*, 82 Hawai`i 269, 921 P.2d 1170 (App. 1996) ........ 40

*United States v. Wyatt*, 408 F.3d 1257, 1261 (9th Cir. 2005) ........ 43

## **RULES**

Fed. R. Civ. P. 56............................................................................ 10

Fed. R. Civ. P. 56(a) ....................................................................... 10

H.A.R. §§ 4-66-1 through -67 ................................................. 22, 23

H.A.R. §§ 4-68-4, 5, 8..................................................................... 29

H.A.R. § 4-68-6 ............................................................................... 28

## **STATUTES**

H.R.S. § 26-16(a) ............................................................................ 12

H.R.S. § 46-1.5 ................................................................... 15, 30

H.R.S. § 46-17 ............................................................. 30, 31, 32

H.R.S. § 92F ......................................................................... 24

H.R.S. § 92F-13 .................................................................... 24

H.R.S. Chapter 141 ............................................................... 12

H.R.S. §141-2(1), (2), (6) ..................................................... 26

H.R.S. § 147-121 ................................................................... 26

H.R.S. § 148A-15(c) .............................................................. 21

H.R.S. Chapter 149A .............................................................. 17

H.R.S. § 149A-2 ..................................................................... 22

H.R.S. §§ 149A-11, -13, -31 ............................................ 17, 21

H.R.S. § 149A-14(a)(1), (4) .................................................. 22

H.R.S. § 149A-19 ........................................................ 17, 18, 21

H.R.S. § 149A-23 ................................................................... 19

H.R.S. § 149A-31.2 ................................................................ 23

H.R.S. § 149A-32.5 ................................................................ 22

H.R.S. § 149A-33 ........................................................... 18, 21

H.R.S. § 149A-51 ................................................................... 18

H.R.S. § 150A-6.1(1), (b) ...................................................... 28

H.R.S. § 150A-10 ............................................................................ 29

H.R.S. § 152-1 .......................................................................... 29, 30

H.R.S. § 163D-1 ............................................................................ 13

H.R.S. § 163D-5 ............................................................................ 14

H.R.S. § 165-3 ............................................................................... 13

H.R.S. § 165-4 ............................................................................... 13

H.R.S. § 226-1 ............................................................................... 13

H.R.S. § 226-7(b)(12) .................................................................... 13

## **OTHER**

7 C.F.R. § 340 ................................................................................ 36

40 C.F.R. § 152.130(a) ................................................................. 39

40 C.F.R. §§ 156.200-156.212 ........................................................ 5

40 C.F.R. § 162.153(e)(5) ............................................................. 23

40 C.F.R. Part 174 ......................................................................... 38

7 U.S.C. §§ 136-136y .............................................................. 5, 34

7 U.S.C. § 7701 *et seq.* .......................................................... 36, 38

7 U.S.C. § 7702(9)(E)-(F) .............................................................. 38

7 U.S.C. § 7756(b)(1) .................................................................... 37

Hawai`i Const. art. I § 5; U.S. Const. amend. XIV .......................... 39

HAW. CONST. ART. III, § 1 .................................................................. 15

HAW. CONST. ART. XI § 1 .................................................................. 12

HAW. CONST. ART. XI, § 3 .................................................................. 11

HAW. CONST. ART. XI, § 5 .................................................................. 15

Restatement (Second) of Torts § 821B ........................................... 32

U.S. Const., Art. VI, cl. 2 ............................................................... 32

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT OF CLAIMS ONE,
THREE, FOUR, AND FIVE OF FIRST AMENDED COMPLAINT**

## I.    INTRODUCTION

This lawsuit involves pesticides and genetically modified organisms ("GMOs"), both of which are critically important to the past, present, and future success of agriculture.  Unfortunately, both are also under attack by special interests.  For many years, the plaintiffs in this lawsuit (the "Growers") have used pesticides to grow crops from genetically modified seeds on Kaua`i subject to comprehensive regulation by both the State of Hawai`i and the Federal Government.

This lawsuit arises out of an unprecedented attempt by the County to thrust itself into that robust regulatory framework.  The law at issue here, Bill 2491—now codified as Ordinance 960— saddles Growers with unnecessary and burdensome disclosure requirements relating to pesticides and GMOs, and prohibits them outright from growing *any* crops in arbitrarily drawn "buffer zones." The Bill imposes stiff civil and criminal penalties applicable only to five entities, including the four plaintiff Growers.

1

By imposing these unreasonable and arbitrary restrictions in an area where it has no regulatory authority, the County has left Growers with no choice but to bring this lawsuit. Growers now move for summary judgment on Counts One, Three, Four, and Five of their First Amended Complaint, involving both state and federal preemption and violations of their state and federal constitutional rights. Growers respectfully request this Court grant this motion and nullify Bill 2491 before it takes effect on August 16, 2014.

## II.   BACKGROUND FACTS

### A.   Growers' Production of GM Seed on Kaua`i

Growers are all major suppliers of seed to domestic and international markets. *See* Declarations of Keith Horton, Steven Lupkes, Richard McCormack and Steven Kai (collectively "Growers' Decls.") ¶ 4. Since long before Bill 2491, they have grown genetically modified ("GM") crops on Kaua`i. *Id.* A key component of this business is the research and development of new and improved seed varieties, for which there is a constant demand. *Id.* Kaua`i plays a crucial role in Growers' development of new hybrid and varietal GM seed. *Id.* ¶ 5. The island's temperate climate provides a year-round growing season in which three generations of

2

seed can be produced per year.  *Id.*  Virtually all of the seed that

Growers plant on Kaua`i arrives from the U.S. mainland or abroad

and, in turn, virtually all of the seed that Growers produce on

Kaua`i is shipped within the United States or to foreign countries.

*Id.* ¶ 4.

State and federal regulators oversee Growers' GM seed farming

activities on Kaua`i.  *Id.* ¶¶ 6-7.  All GM seeds grown on Kaua`i are

or have been "regulated articles" subject to extensive regulatory

scrutiny.  *Id.* ¶ 6.  Seeds that remain regulated articles (*i.e.*, that

have not completed a comprehensive federal "deregulation process"

by which a seed is deemed safe and acceptable for public sale and

use) are planted under regulatory restrictions that are field- and

crop-specific.  *Id.*

State and federal regulators conduct regular and frequent

inspections of Growers' fields to ensure compliance with planting

restrictions.  *Id.* ¶ 7.  Growers' field personnel on Kaua`i regularly

collect monitoring notes for each field planted with regulated article

seed.  *Id.*  These notes and other location-specific data are provided

to the regulators for their use in monitoring compliance, but that

information is not publicly disclosed to protect against vandalism

and theft of trade secrets.  *Id.*

Deregulated GM crops are grown using good farming practices, consistent with Growers' need to maintain the purity of their traits and develop marketable products for use by farmers.  *Id.* ¶ 8.

### B.   Growers' Application of Pesticides on Kaua`i

Consistent with generally accepted agricultural and management practices, Growers use various insecticides, herbicides, and fungicides (collectively, "pesticides") in their farming operations on Kaua`i.  *Id.* ¶ 9.  These include both general use pesticides ("GUPs") and restricted use pesticides ("RUPs").  *Id.* Growers each use more than five pounds or fifteen gallons of one or more single RUPs in their Kaua`i farming operations per year.  *Id.*

All pesticides used by Growers on Kaua`i are registered for use by state and federal regulators, and all pesticides are applied consistent with the label directions established by those regulators.  *Id.* ¶ 10.  The label directions govern all aspects of pesticide application, including frequency of application, dilution prior to application, and environmental conditions that preclude pesticide application.  *Id.*

4

Consistent with Hawai`i law, Growers only allow pesticide applicators certified by the State (or capable persons under their direct supervision) to apply RUPs. *Id.* ¶ 11. Growers provide warnings in compliance with the worker reentry protection requirements established by the Environmental Protection Agency ("EPA"), 40 C.F.R. §§ 156.200-156.212, pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136y. *Id.* Growers do not aerially apply pesticides on Kaua`i. *Id.*

In addition, Growers maintain application records for all GUPs and RUPs applied on Kaua'i as required by federal and state laws. *Id.* ¶ 12. These records are inspected by the Hawai`i Department of Agriculture ("HDOA") during routine inspections. *Id.* Some of the inspections focus on worker protection. Indeed, HDOA inspectors interview employees and review records during those inspections. *Id.* As a matter of routine, records of Growers' usage of GUPs and RUPs are made available to the HDOA. *Id.*

## C.   The Prevalence of GM Crops

GM crops have become the primary source of corn and soybean products in the United States. In 2012, for example, over

90% of the U.S. corn crop and 93% of the U.S. soybean crop were produced from GM seed[1] and approximately 97 million acres of corn and 77 million acres of soybeans were planted in the U.S.[2]  GM crops were grown on more than 420 million acres in 28 countries around the world that year.[3]

### D.    The Provisions of Bill 2491

The stated purpose of Bill 2491 is "to establish provisions to inform the public, and protect the public from any direct, indirect, or cumulative negative impacts on the health and the natural environment" from the use of pesticides and GMOs.  Bill 2491 (Ex. 1 to Pls' Concise Statement of Facts in Support of Mot. ("CSF")) § 22-22.2.  It imposes extensive pesticide and GMO reporting requirements, prohibits the growing of *any* crops in broad buffer

---

[1] *See* USDA Economic Research Service, Recent Trends in GE Adoption, http://www.ers.usda.gov/data products/adoption of genetically engineered crops in the us/recent trends in ge adoption/ (last updated July 9, 2013).

[2] *See* USDA National Agricultural Statistics Service, Statistics by Subject, http://www.nass.usda.gov/Statistics_by_Subject/index.php/ (last visited April 4, 2014).

[3] *See* International Service for the Acquisition of Agri-biotech Applications, ISAAA Brief 44-2012: Executive Summary, Global Status of Commercialized Biotech/GM Crops: 2012/ http://www.isaaa.org/resources/publications/briefs/44/executives ummary/default.asp (last visited April 4, 2014).

zones, and requires the County to undertake an Environmental and Public Health Study ("EPHIS") regarding pesticide and GMO use by "large scale commercial agricultural entities." *Id.* §§ 22-22.4, -22.5, -22.6.

The Bill's pesticide reporting and buffer zone provisions only apply to "commercial agricultural entities" ("CAEs") that purchase or use more than five pounds or fifteen gallons of any single RUP annually.  *Id.*  As detailed below, members of the County Council confirmed these provisions were designed to apply to just five entities, including the four Growers who are Plaintiffs here.[4]

The Bill's main provisions are:

- Pesticide Application Disclosures: (a) weekly notice to requesting persons within 1500 feet of the CAE's property of all planned pesticide applications (both restricted and general use pesticides), including identification of pesticide to be used, active ingredient, date, time and field number; (b) post-application notice within 24 hours of unplanned pesticide applications to the same group; and (c) a weekly post-application public report to be posted on-line on the County website including facility map, date, time, field number, total acreage, trade name of pesticide used, EPA registration number, active ingredient of pesticide used, gallons or pounds used,

---

[4] The five companies include the four Growers and Kaua`i Coffee Company ("Kaua`i Coffee").  *See* Council Meeting Minutes (June 26, 2013) at 103 (Ex. 2 to CSF).

temperature, wind direction and wind speed at time of pesticide application.

- GMO Disclosures: *all* CAEs that possess any GMO must provide an annual report for posting online.  The report must describe the GMO, specify the geographic area in which the GMO is being grown or developed, and the dates on which each GMO was initially introduced to the land in question.

- Buffer Zones:  no crops other than cover crops to which no pesticide is applied be grown within (a) 500 feet of any housing facility, family or child care facility, medical facility, nursing home, residential care home, school, or residence; (b) 250 feet of any park (with an exception for mature orchards);(c) 500 feet of any dwelling; (d) 100 feet of any public roadway in the absence of notification signage; or (e) 100 feet of any shoreline or perennial waterway that flows into the ocean except for any irrigation ditch or drainage canal that does not directly flow to the ocean.

*Id.* §§ 22-22.4(a), (b); 22-22.5.

The Bill provides that violations will be subject to a variety of civil and criminal penalties, including imprisonment, on the basis of strict liability.  *Id.* § 22-2.7.  The Bill also includes a severability clause.  *Id.* § 22-22.8.

## E.    The County Council Testimony in Enacting Bill 2491

The public testimony of the members of the County Council that preceded enactment of Bill 2491 demonstrates the County's

8

intent to target Growers and Kaua`i Coffee and not any other entity on Kaua`i that uses RUPs in similar or greater quantities. Councilmember Gary Hooser testified that "five companies [are] doing all of this – the vast majority, 99%. … They are multibillion dollar international companies.  They can pay a little bit of money to hire County employees to enforce this."  Council Meeting Minutes (June 26, 2013) at 29-30 (Ex. 2 to CSF). Councilmember Tim Bynum testified that "we are kicking agricultural producers, *kama`aina* agriculture producers off the land in favor of the seed companies who are not producing anything for us to eat and they are not even paying appropriate taxes so our taxpayers are subsidizing."  Economic Dev. & Intergovernmental Relations Comm. Minutes (Aug. 5, 2013) at 12 (Ex. 3 to CSF).  Councilmember JoAnn Yukimura took pains to emphasize that the purpose of the threshold criteria "is to make sure that we are not including smaller farmers," but only "five (5) companies."  Special Council Meeting Minutes (Oct. 8, 2013) at 162 (Ex. 4 to CSF).  In opposing the Bill, Councilmember Mel Rapozo testified that it would "not affect anybody else that uses pesticides like resorts and golf courses. … It is simply targeted for the seed companies."  *Id.* at 207.

## III.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on any claim, defense, or part of any claim of defense, and the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Because there is no genuine dispute about any material fact relevant to this motion, and Growers are entitled to summary judgment as a matter of law, this Court should grant this motion.

## IV.   ARGUMENT

### A.   Under The Hawai\`i Constitution, The County Had No Authority To Enact Bill 2491.

The County's authority to pass laws is limited by the supremacy provisions of Article VIII of the state Constitution. *Richardson v. City & County of Honolulu*, 76 Hawai\`i 46, 65 n.26, 868 P.2d 1193, 1212 .26 (1994).  "[T]he Constitution permits local government powers by the allocation method, rather than by the shared residual powers method.  Under the allocated powers

10

method, *powers are granted by the State to local governments.*"
*County of Kaua`i v. Baptiste*, 115 Hawai`i 15, 44, 165 P.3d 916, 945
(2007) (citation omitted; emphasis added).

Accordingly, Kaua`i lacks authority to enact ordinances on
*any* matter unless expressly permitted to do so by the state
Legislature.  *See, e.g.*, *City & County of Honolulu v. Ariyoshi,* 67
Haw. 412, 419, 689 P.2d 757, 763 (1984) (compensation of county
personnel subject to state legislative control); *HGEA v. County of
Maui*, 59 Haw. 65, 87, 576 P.2d 1029, 1042 (1978) (voiding county
charter provisions that conflicted with state civil service statute).

Here, the County cannot act because the Hawai`i Constitution
vests exclusive authority over agriculture at the *state* level:

> *the State* shall conserve and protect agricultural lands,
> promote diversified agriculture, increase agricultural self-
> sufficiency and assure the availability of agriculturally
> suitable lands.  *The legislature* shall provide standards
> and criteria to accomplish the foregoing.

HAW. CONST. ART. XI, § 3 (emphasis added).  In other words, because
the promotion of agriculture serves a vital public interest, the
Hawai`i Constitution vests the State with exclusive power to
establish a comprehensive and uniform agricultural policy.

The wording of the Constitution is significant:  Another

11

provision of Article XI expressly authorizes "the State *and its political subdivisions*" to "conserve and protect Hawaii's natural beauty and all natural resources," HAW. CONST. ART. XI § 1 (emphasis added), thereby underscoring that the drafters of the Constitution knew how to vest "political subdivisions" with regulatory authority when they wanted to do so.  Tellingly, they did not give the counties any regulatory authority over agriculture.

The Legislature has exercised its exclusive constitutional authority over agriculture in several ways.  *First*, the Legislature created the HDOA and gave it comprehensive regulatory authority over agriculture.  *See generally* H.R.S. Chapter 141.  The Legislature specified that, "The department of agriculture shall be headed by an executive board to be known as the board of agriculture," and that "[t]he board shall consist of ten members," including at least one resident of each county, thereby ensuring that Kaua`i has been represented in state agriculture policy.  H.R.S. § 26-16(a).

*Second*, the Legislature enacted the Right to Farm Act, under which "[t]he preservation and promotion of farming is declared to be in the public purpose and deserving of public support."  H.R.S.

12

§ 165-3.  To promote that public interest and ensure uniform agriculture practices statewide, the Act specifies that "[n]o court, official, public servant, or public employee shall declare any farming operation a nuisance for any reason if the farming operation has been conducted in a manner consistent with generally accepted agricultural and management practices."  H.R.S. § 165-4.

*Third*, the Legislature enacted the Hawai`i State Planning Act, which creates a statewide plan "to improve coordination among different agencies and levels of government, to provide for wise use of Hawai`i's resources and to guide the future development of the State."  H.R.S. § 226-1.  The Act also specifies the State's objectives with regard to agriculture and the policies necessary to achieve these objectives, including "promoting growth and development of …food crops[.]"  *Id.* § 226-7(b)(12).

And *fourth*, the Legislature created the Agribusiness Development Corporation, which is "a vehicle and process to make optimal use of agricultural assets for the economic, environmental, and social benefit of the people of Hawaii."  H.R.S. § 163D-1.  The statute "establishes a public corporation to administer an aggressive and dynamic agribusiness development program."  *Id.*

13

The corporation is required to "prepare the Hawaii agribusiness plan which shall define and establish goals, objectives, policies, and priority guidelines for its agribusiness development strategy." *Id.* § 163D-5.

There can be no dispute that Bill 2491 seeks to regulate agriculture. By its very terms, the Bill seeks to "govern[] the use of pesticides and genetically modified organisms (GMOs) *by large-scale commercial agricultural entities on Kaua`i.*" Bill 2491 § 22-22.1 (emphasis added). *Only* these agricultural entities are affected by the Bill's restrictions on agricultural practices. Indeed, the Bill expressly defines "Agriculture," directs certain agricultural entities to make disclosures about their agricultural practices, and prohibits them from engaging in agricultural practices in certain specified "pesticide buffer zones." *Id.* §§ 22-22.3, -22.4, -22.5. If this does not amount to impermissible County regulation of agriculture, it is hard to know what would.

Finally, under no circumstances does Kaua`i have authority to regulate the use of state-owned land by imposing buffer zones or otherwise interfering with agricultural activities. Under the Hawai`i Constitution, *"[t[he legislative power* over the lands owned by or

under the control of the State and its political subdivisions *shall be exercised only by general laws*, except in respect to transfers to or for the use of the State, or a political subdivision, or any department or agency thereof." HAW. CONST. ART. XI, § 5 (emphasis added); H.R.S. § 46-1.5 (State-granted county powers "[s]ubject to general law"). "Legislative power" is vested only in the State Legislature. HAW. CONST. ART. III, § 1 ("The legislative power of the State shall be vested in a legislature."). Thus, only the Legislature, and not the County, may enact laws regulating state-owned lands, including state lands leased by Growers.

## B.   State Statutory Law Preempts Bill 2491.

In addition to being constitutionally prohibited, Bill 2491 is preempted by state law. The Hawai`i Supreme Court has explained that an

> ordinance may be pre-empted … if (1) it covers the same subject matter embraced within a comprehensive state statutory scheme disclosing an express or implied intent to be exclusive and uniform throughout the state or (2) if it conflicts with state law.

*Richardson*, 76 Hawai`i at 62, 868 P.2d at 1209. As *Richardson* explains, "it is clear that HRS § 46–1.5(13) was intended to be *a*

15

*provision mandating the pre-emption of any ordinance* that either conflicted with the intent of a state statute or legislated in an area already staked out by the legislature for exclusive and statewide statutory treatment." *Id.* (emphasis added); *see also Citizens Utilities Co. v. County of Kaua`i*, 72 Hawai`i 285, 288, 814 P.2d 398, 400 (1991) (finding preemption where the Supreme Court sees "an overall [statutory] scheme which reserves to a [state agency] the power to regulate [the subject matter of the act], thereby serving as a limitation to the powers of the counties"); *In re Application of Anamizu*, 52 Haw. 550, 554, 481 P.2d 116, 118 (1971) (finding preemption where state statute "established a comprehensive statutory scheme for regulating" a particular field).

Because Bill 2491 is a "local ordinance [which] duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication," *State v. Ewing*, 81 Hawai`i 156, 161, 914 P.2d 549, 554 (App. 1996) (internal quotation marks omitted), it flunks the Hawai`i Supreme Court's preemption test, both with respect to its provisions regulating pesticides and GMOs.

  1. **The Hawai`i Pesticides Law Preempts The Pesticide Provisions Of Bill 2491.**

Bill 2491 seeks to regulate pesticides in two ways: (1) by imposing unreasonable pre- and post-application disclosure requirements, and (2) by establishing a variety of "buffer zones" in which *no* crops can be grown to "restrict the application of pesticides." Bill 2491 §§ 22-22.4(a), -22.5. The Legislature, however, has established a comprehensive, statewide statutory scheme for the regulation of pesticides—the Hawai`i Pesticides Law, H.R.S. Chapter 149A. Based on the uniform and exclusive regulatory regime created by the Pesticides Law and its implementing rules, the Legislature left no room for counties to interfere in pesticide regulation, as Bill 2491 attempts to do.

The Pesticides Law provides that each pesticide, each specific use pattern for each pesticide, and each person who commercially applies any such pesticide for any such specific use pattern in the state must first be licensed by the state Board of Agriculture ("Board") and the HDOA before that pesticide may be sold or used in the state. H.R.S. §§ 149A-11, -13, -31. The Legislature delegated exclusive power to the Board to enact rules to implement the purposes, objectives, and functions of the statute. H.R.S. § 149A-19.

17

Thus, in a provision tellingly entitled "Determination; rules; *uniformity*," the statute specifies:

(a)    The board, after having afforded interested and affected parties an opportunity to be heard and, in instances in which human health is affected, after consultation with the director of health, shall adopt rules to:

(1)    Determine the pesticides that are highly toxic to humans, designate pesticides as restricted use or nonrestricted use, and establish a system of control over the distribution and use of certain pesticides and devices purchased by the consuming public;

H.R.S. § 149A-19(a)(1) (emphasis added); *see also* H.R.S. § 149A-33 ("The department shall have the authority to carry out and effectuate the purpose of this chapter by rules ....").[5]

The Legislature delegated to the Board and the HDOA, and *only* those entities, regulatory authority over pesticides. Nothing in

---

[5] The Hawai`i Pesticides Law also established a Pesticide Advisory Committee to "advise and assist the department in developing or revising laws and rules to carry out and effectuate the purposes of this chapter and in advising the department in pesticide problems." H.R.S. § 149A-51. The Committee must include representatives from other state agencies, academia, and industry, as well as from "an environmental organization" and "a citizen group." *Id.* These provisions underscore that the HDOA must take into account a diversity of views, which in turn underscores that the regulatory scheme was intended to be comprehensive.

18

the Pesticides Law remotely suggests that counties have any role to play in this process.  Thus, "[t]o allow [a] County to [impose additional regulation] would be inconsistent with the intent of the statutory language expressly authorizing the [state agency] to supervise and regulate" the subject matter of the statute.  *Citizens Utils.*, 72 Haw. at 288, 814 P.2d at 400 (holding Public Utilities Commission had exclusive regulatory power over utilities); *see also Anamizu*, 52 Haw. at 554, 481 P.2d at 118 (finding preemption where a state statute required "[a]ll persons who wish to engage in the [regulated] business ... [to] obtain a state license, issued by a state agency" and granted the agency "broad powers relative to the licensing and regulating of" the subject matter of the statute and to "promulgate regulations" of its own) (footnotes omitted).

Underscoring the legislative command for uniformity, the Pesticides Law further provides that "[t]he department may cooperate or enter into agreements with [1] any other agency of the State or [2] any agency of the federal government for the purpose of carrying out this chapter and securing uniformity of rules."  H.R.S. § 149A-23.  This provision makes no reference to cooperation with counties, presumably because the Pesticides Law contemplates no

19

role for county governments in pesticide regulation.  It would be odd, to say the least, to suppose that the statute allows counties to regulate pesticides when it does not even authorize the HDOA to "cooperate" with them on this subject.  Given the absence of any authority from the Legislature to the counties to regulate pesticides, Bill 2491 would "thwart the State from performing its duty" under the  Pesticides Law, *Kunimoto v. Kawakami*, 56 Haw. 582, 585, 545 P.2d 684, 686 (1976), and is thus preempted.

In particular, the Bill's buffer zone provisions directly intrude into an area the Legislature explicitly intended to be covered exclusively by the Pesticides Law.  The Bill attempts to limit pesticide use by prohibiting the growing of *any* crops in certain arbitrary buffer zones.  *See* Bill 2491 § 22-22.5.  But the Pesticides Law contains a comprehensive state statutory scheme governing the safe and prudent use of pesticides.  The Legislature specifically authorized the HDOA to "establish *limitations and conditions for the application of pesticides* by aircraft, power rigs, mist blowers, and other equipment," and "[t]o establish, as necessary, specific standards and guidelines which specify those conditions which constitute unreasonable adverse effects on the environment."

20

H.R.S. § 149A-33(2), (3) (emphasis added); *see also* H.R.S. § 148A-15(c) ("The board, after public hearing, shall adopt rules applicable to and in conformity with the primary standards established by [the Act] or as prescribed by FIFRA with respect to pesticides.").

The Board's comprehensive risk-utility licensing analysis culminates in a decision whether the pesticide label contains all necessary limitations and restrictions of use to prevent unreasonable adverse effects on man or the environment.  Thus, it is "unlawful for any person to" sell "[a]ny pesticide which is not licensed pursuant to section 149A-13," "[a]ny pesticide which contains any substance or substances in quantities highly toxic to humans, determined as provided in section 149A-19," or "[a]ny pesticide ... which is adulterated or misbranded as defined in section 149A-2."  H.R.S. § 149A-11(a)(1), (3), (5); *see also id.* § 149A-11(b)(1)-(7) (enumerating other unlawful acts); *id.* § 149A-13(a) ("Any pesticide which is received, used, sold, offered for sale, or distributed *within this State* shall be licensed by the board.")(emphasis added).  Further, the HDOA "may refuse to license a pesticide when it has been determined that ... [t]he pesticide or its labeling does not comply with [the Law] or the rules

21

adopted under [the Law]; or … [t]he proposed use would result in

unreasonable adverse effect[s] on the environment." H.R.S. § 149A-

14(a)(1), (4).

Notably, under the Pesticides Law, "environment" is broadly

defined to include "water, air, land, and all plants and humans and

other animals living therein, and the interrelationships which exist

among these." H.R.S. § 149A-2. Likewise, "unreasonable adverse

effects on the environment" means "any unreasonable risk to

humans or the environment, taking into account the economic,

social, and environmental costs and benefits of the use of the

pesticide." *Id*. To police these measures, the Pesticides Law vests

sweeping enforcement powers in the chair of the Board of

Agriculture to "suspend, cancel or restrict" any pesticide use in the

State. H.R.S. § 149A-32.5.

In addition, as contemplated by the Legislature, the Board has

enacted detailed rules and regulations to enforce the statutory

requirements. *See* H.A.R. §§ 4-66-1 through -67. Significantly, the

Board's rules already take into account geographic limitations for

pesticide use, which are functional buffer zones. The Board is

empowered to determine whether a pesticide's label contains

adequate "[l]imitations or restrictions on use required to prevent unreasonable adverse effects on humans or the environment, [including] [w]arnings as required against use on certain crops, animals, objects, or *in or adjacent to certain areas*[.]"  H.A.R. § 4-66-23(9) (emphasis added).  Thus, when the Board determines that a proposed product label does not adequately provide appropriate limitations or restrictions on use (including warnings as required against use in or adjacent to certain areas), the Board either refuses to register the product or, alternatively, may require supplemental labeling to address a special local need under 40 C.F.R. § 162.153(e)(5).  These provisions leave no room for counties to impose additional conditions on the use of pesticides by imposing arbitrary buffer zones.

Like the buffer zone requirements, the pesticide disclosure provisions of Bill 2491 also intrude directly into an area covered exclusively by the Pesticides Law.  Pesticide records disclosure is already mandated by a 2013 amendment to the Pesticides Law, which requires the HDOA to post online records and reports of RUP use.  Specifically, H.R.S. § 149A-31.2 requires the HDOA to "publish on its website the public information contained in all

restricted use pesticide records, reports, or forms submitted to the department ... provided that the department shall not post information on its website protected by [H.R.S.] section 92F-13."

Bill 2491's disclosure provisions not only cover the same terrain as the Pesticides Law, but also conflict with that statute because the Bill lacks the confidentiality and privacy protections under the Uniform Information Practices Act ("UIPA"), H.R.S. Chapter 92F, built into the Law's 2013 amendment.

Under UIPA, a government agency may not disclose public records that fall under five specific categories, including "records which, if disclosed, would constitute a *clearly unwarranted invasion of personal privacy,*" "records that, by their nature, *must be confidential* in order for the government to avoid the frustration of a legitimate government function," or "records which, pursuant to state or federal law including an order of any state or federal court, are *protected from disclosure*[.]" H.R.S. §92F-13 (emphasis added).

Bill 2491, as noted above, requires weekly public disclosures to the County of Kaua`i Office of Economic Development ("OED") "regarding the actual application of all pesticides during the prior week" that must contain the "date; time; field number; total

24

acreage; trade name of pesticide used; EPA registration number; active ingredient of pesticide used; and temperature; wind direction, and wind speed at time of pesticide application."  Bill 2491 § 22-22.4(a)(3).  Each such weekly report "shall include online access to a legible map showing all field numbers and any key, legend, or other necessary map descriptions for all applicable commercial agricultural entities," and "shall be posted online, and available for viewing and download by any interested persons," *id.*; *see also id.* § 22-22.4(a)(4) (requiring the same detailed disclosures via an emergency response hotline).  Despite the requirement to disclose all this information, Bill 2491 lacks any mechanism for safeguarding trade secrets or confidential business information.  *Id.*

Because Bill 2491 requires that Growers' weekly pesticide application reports be posted online without regard to the protections imposed by UIPA, the Bill's disclosure requirement "conflicts with state law," *Richardson*, 76 Hawai`i at 62, 868 P.2d at 1209, and therefore is preempted.

2.   **State Statutory Law Preempts The GMO Provisions Of Bill 2491.**

Bill 2491 seeks to regulate GMOs by imposing disclosure

requirements on commercial agricultural entities that grow GMOs. *See* Bill 2491 § 22-22.4(b).  In particular, such an entity must provide the County and the HDOA "[a]nnual public reports" that "shall include a general description of each genetically modified organism ..., a general description of the geographic location ... where each genetically modified organism is being grown or developed, and dates that each genetically modified organism was initially introduced to the land in question."  *Id.*

Once again, however, this field is fully occupied by state statutory law.  The statutes establishing the HDOA specify that

> the department ... shall adopt, amend, and repeal rules ... for and concerning: (1) The introduction ... and propagation of ... plants; (2) The quarantine, inspection, ... destruction, or exclusion ... of any ... seed ... or any other plant growth or plant product ... that is or may be in itself injurious, harmful, or detrimental to [the agricultural or horticultural industries or forests of the State]; [and] (6) The manner in which agricultural product promotion and research may be undertaken after coordination with the agribusiness development corporation.

H.R.S. § 141-2(1), (2), (6).  And, as especially relevant here, "[t]he department is designated as the official certifying agency for certifying seed concerning genetic purity, identity, quality, and condition for the State."  H.R.S. § 147-121.

26

The GMO provisions in Bill 2491 are said to arise from concern (which the County has no evidence to validate) that "[g]enetically modified plants could potentially disperse into the environment of the County of Kaua`i through pollen drift, seed commingling, and inadvertent transfer of seeds by humans, animals, weather events, and other means," and that "[t]his could have environmental and economic impacts."  Bill 2491 § 22-22.1(f).

However, these alleged concerns are *precisely* the same concerns that the Legislature has charged the HDOA with considering and regulating on an exclusive and uniform basis.  This statewide regulatory regime leaves no room for supplemental or inconsistent regulation of GMOs by counties.

Indeed, the HDOA—through the Board—may restrict by rule and require permits for the introduction of plants that genuinely raise the type of concerns the County purports to find:

> (a)    The board shall maintain a list of restricted plants that require a permit for entry into the State.  Restricted plants or any portion thereof shall not be imported into the State without a permit issued pursuant to rules.
>
> (b)    The department shall designate, by rule, as restricted plants, specific plants that may be detrimental or potentially harmful to agriculture, horticulture, the environment, ... or public health[.]

27

H.R.S. § 150A-6.1(a), (b).  The Board's deliberations are assisted by an advisory committee that includes "the chairperson of the board of land and natural resources, the director of the office of environmental quality control, the director of the department of health," and five other members who "are thoroughly conversant with modern ecological principles and the variety of problems involved in the adequate protection of [the State's] natural resources."  H.R.S. § 150A-10.

There can be no doubt that the HDOA's rules comprehensively address the County's stated concerns over:

 (1)    A plant species that is causing or has the potential of causing severe production losses or increased control costs to the agricultural, horticultural, aquacultural, or livestock industries; or

(2)    A plant species that is or has the potential of endangering native flora and fauna by encroachment in forest and conservation areas; or

(3)    A plant species that is or has the potential of hampering the full utilization and enjoyment of recreational areas including forest and conservation areas; or

(4)    A plant species that is poisonous, injurious, or otherwise harmful to humans or animals.

H.A.R. § 4-68-6.

And the HDOA has express regulatory authority to address "[a] plant species that reproduces by seeds capable of being dispersed over wide areas," H.A.R. § 4-68-4, "[a] plant species that is capable of competing with cultivated crops for nutrients, water or sunlight; or reproduces by seeds capable of being dispersed over wide areas," *id.* § 4-68-5, and "[a] plant species that is not known to occur in one or more islands of the State," *id.* § 4-68-8.

In sum, the HDOA has established a comprehensive framework for regulating plants that present the very risk of "environmental and economic impacts" that the GMO provisions of Bill 2491 purport to address.  Bill 2491 § 22-22.1(f).

If the County believes the alleged concerns about GMOs are valid—despite the absence of any sound science validating those fears—its remedy is not through legislation like Bill 2491.  Rather, it must ask the HDOA to exercise its regulatory authority over "any plant species which is, or which may be likely to become, injurious, harmful, or deleterious to the agricultural ... industry of the State and to forest and recreational areas and conservation districts of the State, as determined and designated by the department from time to time."  H.R.S. § 152-1.

29

### 3. **H.R.S. § 46-17 Does Not Allow The County To Enact Bill 2491.**

The County cannot save Bill 2491 from preemption by invoking H.R.S. § 46-17, one of the two sources of statutory authority cited for the Bill. *See* Bill 2491 § 22-22.1(d), (k).[6]  That provision authorizes counties to "adopt and provide for the enforcement of ordinances regulating or prohibiting noise, smoke, dust, vibration, or odors which constitute a public nuisance." H.R.S. § 46-17.  Where that provision applies, it alters ordinary preemption principles: by the terms of the statute, "[n]o … ordinance [enacted under that provision] shall be held invalid on the ground that it covers any subject or matter embraced within any statute or rule of the State; provided that in any case of conflict between a state statute or rule and an ordinance, the law affording the most protection to the public shall apply[.]" *Id.*

But H.R.S. § 46-17 has no bearing here.  Bill 2491's express purpose is to "govern[] the use of pesticides and genetically modified

---

[6] The other source of authority cited for the law, H.R.S. § 46-1.5(13), adds nothing to the preemption analysis, because it specifies on its face that it is governed by ordinary preemption principles, *Richardson*, 76 Hawai`i at 62, 868 P.2d at 1209, and thus Bill 2491 is preempted based on the analysis above.

30

organisms."  Bill 2491 § 22-22.2; *see also id.* § 22-22.1.  Although the Bill's findings mention "dust," its substantive provisions do not purport to "regulat[e] or prohibit[] noise, smoke, dust, vibration, or odors" as required for H.R.S. § 46-17 to apply.  Rather, the Bill imposes disclosure requirements for pesticides and GMOs, and establishes "buffer zones" where no crops can be grown "to restrict the application of all pesticides."  *Id.* §§ 22-22.4, -22.5.

The "finding" in the preliminary section of the Bill that "[d]ust and drift from both restricted use pesticides and general use pesticides sometimes travel beyond commercial agricultural operations," Bill 2491 § 22-22.1(j), does not magically transform the Bill into a regulation of dust or drift.  Beyond the fact that this "finding" is unsubstantiated, it is wholly unlinked to any substantive provision of the Bill purporting to regulate dust or drift.  Needless to say, a county's authority to regulate dust does not give this County *carte blanche* to regulate other matters, such as pesticides and GMOs, that may involve dust where (as here) the regulation is clearly directed to other matters, not dust.

In any event, H.R.S. § 46-17 by its terms only gives counties the authority to regulate "noise, smoke, dust, vibration, or odors

31

*which constitute a public nuisance.*"   H.R.S. § 46-17 (emphasis

added).   The use of a pesticide pursuant to labeling approved by

federal and state regulators is not a public nuisance.   *See, e.g.,*

*Restatement (Second) of Torts* § 821B (public nuisance).   The County

would intrude into the forbidden zone of pesticide regulation,

described in detail above, if it tried to regulate pesticide use through

nuisance law.   Accordingly, this case is subject to an ordinary

preemption analysis, and the provisions of H.R.S. § 46-17 do not

apply.

### C.   Federal Law Preempts Bill 2491.

Bill 2491 is preempted not only by state law, but also by

federal law.   "The Supremacy Clause provides that the laws ... of the

United States 'shall be the supreme Law of the Land ... any Thing in

the Constitution or Laws of any State to the Contrary

notwithstanding.'"   *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466,

2472-73 (2013) (quoting U.S. Const., Art. VI, cl. 2).   "Accordingly, it

has long been settled that state laws that conflict with federal law

are without effect."   *Id.* at 2473 (internal quotation omitted).   "Under

the Supremacy Clause, from which our pre-emption doctrine is

derived, any state law, however clearly within a State's

acknowledged power, which interferes with or is contrary to federal law, must yield." *Id.* (internal quotation, parentheses, and brackets omitted).

### 1. Federal Law Preempts Bill 2491's Mandatory Public Disclosure Of Restricted Use Pesticide Application Data.

Bill 2491, as noted above, imposes onerous disclosure requirements against a small group of pesticide users on Kaua`i. In particular, the Bill requires those users to publicly disclose the exact locations where *all* pesticides—including, but not limited to, RUPs—are applied, and to publicly disclose the exact identity of each pesticide applied. Bill 2491 § 22-22.4(a). The Bill requires these specific disclosures through the posting of signs "that conform to the official label of the pesticide," thus disclosing whether a restricted use pesticide was applied, at each application site, *id.* § 22-22.4(a)(1), as well as through mass notifications that "shall include access to a legible map showing all field numbers and any key, legend, or other necessary map descriptions," *id.* § 22-22.4(a)(2). In addition, the Bill requires weekly public disclosures to the OED "regarding the actual application of *all* pesticides during the prior week" that must contain the "date; time; field number;

33

total acreage; trade name of pesticide used; EPA registration number; active ingredient of pesticide used; and temperature; wind direction, and wind speed at time of pesticide application." *Id.* § 22-22.4(a)(3) (emphasis added).

These detailed disclosure requirements squarely conflict with federal law to the extent they require the disclosure of information regarding restricted use pesticides. In particular, FIFRA requires "certified applicators of restricted use pesticides ... to maintain records comparable to records maintained by commercial applicators of pesticides in each State," and to make such records available "to any Federal or State agency that deals with pesticide use or any health or environmental issue related to the use of pesticides, on the request of such agency." 7 U.S.C. § 136i-1(a), (b). The statute, however, imposes sharp limits on the public disclosure of such information: "*[I]n no case may a government agency release data, including the location from which the data was derived, that would directly or indirectly reveal the identity of individual producers.*" *Id.* § 136i-1(b) (emphasis added).

The extensive and intrusive disclosure requirements of Bill 2491 cannot be squared with this anti-disclosure mandate of

34

federal law.  As noted above, the Bill requires comprehensive disclosure of site-specific data regarding the use of all pesticides, including restricted use pesticides, by regulated entities, "including the location from which the data was derived," which would necessarily "reveal the identity of individual producers[.]"  *Id.* Because Bill 2491 requires the disclosure of information that FIFRA protects, the pesticide disclosure provisions of the Bill are preempted.

The County cannot avoid such preemption by simply requiring pesticide users to disclose the protected information rather than disclosing the information itself.  A government agency cannot evade a prohibition on disclosure by compelling disclosure by someone else.  A disclosure that is compelled by a government agency is, for all intents and purposes, a disclosure by the government agency itself.  It would be "illogical," as the Fifth Circuit has explained, to construe FIFRA to allow government agencies to compel pesticide users to disclose information that those agencies themselves are forbidden from disclosing.  *John Doe #1 v. Veneman*, 380 F.3d 807, 817 (5th Cir. 2004).  At a minimum, such compelled disclosure would frustrate the intents and purposes of Congress in

35

forbidding the disclosure of such sensitive information in the first place.  *See id.* & n.38 (explaining that the legislative history of this provision "indicates that Congress was concerned about protecting the privacy of farmers who use restricted-use pesticides").

### 2.    Federal Law Preempts Bill 2491's Attempt To Regulate GMOs In Field Trials.

Under a federal Coordinated Framework, GMOs are regulated by several federal agencies, including the Department of Agriculture.  Within that Department, the Animal and Plant Health and Inspection Service ("APHIS") regulates GMOs pursuant to the Plant Protection Act ("PPA"), 7 U.S.C. § 7701 *et seq.*  In particular, APHIS regulates GMOs—including all the GMOs used on Kaua`i—as *presumptive* "plant pests" unless and until the agency concludes on the basis of scientific evidence that the GMO is unlikely to pose a plant pest risk.  *See* 7 C.F.R. Part 340.  The agency, however, issues orders authorizing field trials of those regulated articles under appropriate restrictions to prevent their dissemination.  *See id.* Pursuant to such orders, all Growers are currently conducting such field trials on Kaua`i.  *See* Growers' Decls. ¶ 6.

Bill 2491 is preempted to the extent that it purports to regulate GMOs in field trials.  That statute provides in pertinent part as follows:

> [N]o State or political subdivision of a State may regulate the movement in interstate commerce of any article, means of conveyance, plant, biological control organism, plant pest, noxious weed, or plant product in order to control a plant pest or noxious weed, eradicate a plant pest or noxious weed, or prevent the introduction or dissemination of a biological control organism, plant pest, or noxious weed, if the Secretary [of Agriculture] has issued a regulation or order to prevent the dissemination of the biological control organism, plant pest, or noxious weed within the United States.

7 U.S.C. § 7756(b)(1).

Bill 2491's GMO provisions are based on an ostensible "finding" that "[g]enetically modified plants could potentially disperse into the environment … through pollen drift, seed commingling, and inadvertent transfer of seeds by humans, animals, weather events, and other means," and that such dispersal "could have environmental and economic impacts."  Bill 2491 § 22-22.1(f).  But that "finding," and hence the onerous disclosure requirements based thereon, is plainly impermissible under the PPA as applied to GMOs in federally regulated field trials.  As noted above, the APHIS orders authorizing such field trials contain

37

restrictions to prevent the dissemination of the GMO seeds, and therefore preempt the County from further attempting to regulate such dissemination. *See generally* 7 U.S.C. § 7701(9) (specifying that GMOs regulated under the PPA "are in or affect interstate commerce or foreign commerce"); 7 U.S.C. § 7702(9)(E)-(F) (defining "[t]he terms 'move', 'moving', and 'movement' " to include "to release into the environment; or to allow" a release into the environment).

In addition, Bill 2941's attempt to regulate GMOs conflicts with, and is therefore preempted by, the regulatory regime established by APHIS for GM plants and the EPA, which regulates pesticides, including insecticides and other pesticidal substances expressed in those plants. 40 C.F.R. Part 174. Growers have a federal right to conduct GMO field trials in conformance with the APHIS regulations permitting them, and to test and use pesticidal substance expressed in GMOs as specifically authorized by EPA. Any "state law which interferes with the exercise of ... federally protected rights creates an actual conflict and is pre-empted by direct operation of the Supremacy Clause." *Brown v. Hotel & Rest. Employees & Bartenders Int'l Union Local 54*, 468 U.S. 491, 501 (1984). By its terms, the Bill regulates GMOs expressing pesticidal

substances by attaching an additional condition upon the

regulations and orders issued by APHIS that authorize GMO

activities to proceed, and despite EPA's regulation providing that

"[a] registrant may distribute or sell a registered product with the

composition, packaging and labeling currently approved by the

Agency."  40 C.F.R. § 152.130(a).  The conflict between Bill 2491

and the APHIS field trial regulations and EPA pesticide regulations

is preemptive, and Bill 2491's GMO regulation must fail.  *See, e.g.,*

*City of New York v. FCC*, 486 U.S. 57, 63 (1988) (recognizing that

federal regulations, as well as statutes, have preemptive effect).

### D.  Bill 2491 Violates The Equal Protection And Due Process Clauses Of The Federal And State Constitutions.

Finally, even if Bill 2491 could surmount all of the legal

hurdles addressed above, it would remain unenforceable because it

violates both the Equal Protection and Due Process Clauses of the

federal and state constitutions.  *See* HAWAI`I CONST. ART. I § 5; U.S.

CONST. AMEND. XIV.  A state or local law violates those provisions if it

is not "rationally related" to a "legitimate" governmental interest.

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985);

*State v. Sturch*, 82 Hawai`i 269, 276, 921 P.2d 1170, 1177 (App. 1996).

Although this standard is deferential, it is by no means toothless. *See*, *e.g.*, *Romer v. Evans*, 517 U.S. 620, 632 (1996) (invalidating statute under rational-basis review); *Cleburne*, 473 U.S at 447-50 (same); *Plyler v. Doe*, 457 U.S. 202, 216-30 (1982) (same). Under Equal Protection, "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. Furthermore, some objectives—*such as a bare desire to harm a politically unpopular group*—are not legitimate state interests." *Cleburne*, 473 U.S. at 446-47 (citations, quotation marks and ellipsis omitted; emphasis added). Likewise, a "regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Lingle v. Chevron Corp.*, 544 U.S. 528, 548 (2005).

In the Ninth Circuit, a classification must be reasonably justified by the asserted purpose of the legislation in order to survive, even under the rational basis test. *See, e.g., Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 590-91 (9th Cir. 2008). In other

words, the Ninth Circuit does not blindly "accept Defendants' characterization of *what classification they made.*"  *Id.* at 589 (emphasis in original).  Moreover, under the Hawai`i Constitution, a court must examine the actual purposes and effects of a law based upon evidence in the record, and not rely on unsupported, theoretical justifications.  *See, e.g., Sierra Club v. Department of Trans.*, 120 Hawai`i 181, 211, 202 P.3d 1226, 1256 (2009)(striking down legislation due to absence of evidence "in the record" that it was not "special legislation"); *Silva v. City & County of Honolulu*, 115 Hawai`i 1, 14, 165 P.3d 247, 260 (2007) (rational basis review is made "on the record").

Bill 2491 fails this standard of review for three main reasons.  *First*, the Bill's pesticide provisions—both those imposing disclosure requirements, *see* Bill 2491 § 22-22.4(a), and those imposing buffer zones, *see id.* § 22-22.5—arbitrarily and irrationally discriminate among Kaua`i pesticide users.  By their plain terms, those provisions do not apply to *all* pesticide users, but *only* to certain targeted "commercial agricultural entities."  *Id.* §§ 22-22.4(a), -22.5.

This distinction among pesticide users is irrational, because the regulations are not directed at a rationally drawn target.  There

41

is no rational basis for the County to apply the Bill's pesticide provisions only to the targeted agricultural entities, as opposed to other entities, including pest control companies. Not only does Bill 2491 permit pesticide use without restriction by other agricultural users in or near schools, hospitals, parks, dwellings, roadways, shorelines or perennial waterways (subject to applicable federal and state pesticide use limitations), but it also allows private structural pest control companies to apply pesticides within and next to homes and other inhabited structures. This underscores the irrationality of the "buffer zones" claimed to be needed to protect such structures and their inhabitants from pesticide exposure.

Nor is there any real mystery as to what is going on here. As noted above, the County Council acknowledged in enacting the Bill that the pesticide regulations at issue here are limited to just *five* users—the four Growers in this case and Kaua`i Coffee. This is not legitimate pesticide regulation. This is, pure and simple, irrational and illegitimate discrimination against Growers that the constitutions forbid. *See Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990) (citation omitted) ("The rational relation test will not

sustain conduct by state officials that is malicious, irrational or plainly arbitrary.").

*Second*, the distinction by which the Bill discriminates among commercial agricultural entities that use pesticides is itself arbitrary and irrational.  The Bill's pesticide provisions apply only to commercial agricultural entities that "purchase[] or use[]" more than "five (5) pounds or fifteen (15) gallons of any single restricted use pesticide during the prior calendar year."  Bill 2491 §§ 22-22.4(a), 22-22.5.  The Bill does not reveal whether those threshold criteria (whether in pounds and gallons) refer to an active ingredient or an end-use pesticide product—the term "restricted use pesticide" is susceptible to either meaning.  But the difference between the two is vast: many end-use pesticide products (like many pharmaceutical products) contain only a miniscule amount of their active ingredient(s).  That is not a rational basis for regulation intended to impact the products as used, not as purchased.[7]

---

[7] The radically different possible interpretations of the threshold for the pesticide provisions of Bill 2491 also render the provisions impermissibly vague, a particular concern here because Bill 2491 is a criminal statute with no scienter requirement.  *See United States v. Wyatt*, 408 F.3d 1257, 1261 (9th Cir. 2005) ("A scienter requirement can help a law escape a vagueness problem.")

43

However the threshold criteria in the Bill are construed, they remain arbitrary and irrational.  Those criteria have nothing to do with the intensity or the propriety of pesticide use.  For example, a farmer who uses 4.99 gallons on one acre of land is exempt, whereas a seed company that uses 5.01 gallons on 3,000 acres of land is covered—even if the farmer misuses the pesticide in violation of its label while the seed company does not.  That distinction makes no sense: the effect of a pesticide necessarily depends on *how* it is used, not on *how much* is used.  Indeed, the classification drawn by the Bill does not even turn on how much is used; rather, it turns on how much is "*purchased* or used."  Bill 2491 §§ 22-22.4(a), -22.5 (emphasis added).  There is no rational relationship whatsoever between the amount "purchased," but never used, and the environmental and health effects of a pesticide.

In addition, the threshold criteria that trigger the Bill are not related to the Bill's disclosure requirements.  Rather, if those threshold criteria are satisfied with respect to a particular user, then that user must "disclose the use of *all* pesticides of *any* kind," not just the use of the pesticides that triggered the Bill.  *Id.* § 22-

(citing *Posters 'N Things, Ltd. v. United States*, 511 U.S. 513 (1994)).

44

22.4(a) (emphasis added).  This point just underscores the arbitrariness of those threshold criteria:  If disclosure of "the use of *all* pesticides of *any* kind" were really warranted, then the Bill would require disclosure of "the use of *all* pesticides of *any* kind" by *all* users, and not just disclosure by certain targeted users identified by the threshold criteria.

In a similar manner, the threshold criteria that trigger the Bill are not related to the Bill's buffer-zone requirements.  Although the buffer zones were justified by reference to need to "restrict the application of all pesticides in the [buffer] areas," *id.* § 22-22.5(a), the buffer-zone requirements do not merely restrict the use of pesticides in the buffer zones.  Rather, those requirements prohibit the growing of *any crops* within the buffer zones, regardless of whether pesticides are used.  *See id.* § 22-22.5(a)(1)-(5).  Thus, if the Bill is allowed to go into effect, pest-control companies will be allowed to spray restricted-use pesticides within dwellings, schools, and hospitals, and individual farmers will be allowed to spray restricted-use pesticides around dwellings, schools, and hospitals (as well as parks, roadways, shorelines, and perennial waterways), but the targeted users identified by the threshold criteria will not be

45

allowed to grow any crops (with or without pesticides) near dwellings, schools, hospitals, parks, roadways, shorelines, or perennial waterways.  That distinction is wholly arbitrary and irrational.

*Third*, Bill 2491's GMO disclosure provisions serve no legitimate government purpose.  Bill 2491 offers no explanation as to how its GMO disclosure requirements advance the health and safety of the residents and environment of Kaua`i.  There is no explanation.  As described above, the farming of regulated article seed already is heavily regulated by federal and state government on paper and in practice to prevent dispersal of genetic material.  Regulated article products only achieve deregulation after federal regulators accept the extensive test results that must be provided and conclude that the testing demonstrates the product is as safe as non-GMO seed for planting and consumption.  No legitimate objective will be realized by the forced public disclosures under the ordinance, only the illegitimate targeting of GMO crops by vandals and eco-terrorists.

## V.   CONCLUSION

For the foregoing reasons, this Court should grant Growers'

motion for partial summary judgment.

DATED:  Honolulu, Hawai'i, April 14, 2014.


/s/ Paul Alston
PAUL ALSTON
CLAIRE WONG BLACK
Attorneys for Plaintiffs
SYNGENTA SEEDS, INC. &
SYNGENTA HAWAII, LLC

/s/ Margery S. Bronster
MARGERY S. BRONSTER
REX Y. FUJICHAKU
DONNA MARRON
Attorneys for Plaintiffs
PIONEER HI-BRED
INTERNATIONAL, INC. &
AGRIGENETICS, INC.


/s/ Kenneth S. Robbins
KENNETH S. ROBBINS
JOHN-ANDERSON L. MEYER
Attorneys for Plaintiff
BASF PLANT SCIENCE LP


47