IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SYNGENTA SEEDS, INC., ET AL. | ) | CIV. NO. 14-00014 BMK |
| | ) | |
| Plaintiffs, | ) | ORDER ON PREEMPTION AND |
| | ) | ORDER ON VARIOUS MOTIONS |
| vs. | ) | |
| | ) | |
| | ) | |
| COUNTY OF KAUAI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

ORDER ON PREEMPTION AND ORDER ON VARIOUS MOTIONS

Before the Court are various Motions brought by each party in this

case:   Plaintiffs Syngenta Seeds, Inc., Syngenta Hawaii, LLC, Pioneer Hi-Bred

International, Inc., Agrigenetics, Inc., and BASF Plant Science LPs' (collectively,

"Plaintiffs"); Defendant County of Kauai ("the County"); and Intervenors Ka

Makani Ho`opono, Center for Food Safety, Pesticide Action Network North

America, and Surfrider Foundation (collectively, "Intervenors").[1]   The Motions

before the Court seek summary judgment on each of the thirteen claims in Plaintiffs'

---

[1] Ka Makani Ho`opono is a Kauai community group, the Center for Food Safety is a national public interest organization, Pesticide Action Network North America is an international coalition of public interest groups, and the Surfrider Foundation is an international chapter based environmental organization.   Their Motion to Intervene was granted on April 23, 2014.   (Doc. 54.)

First Amended Complaint.[2]   Plaintiffs seek to invalidate Ordinance 960, which was

enacted by the County and imposes regulations on the application of restricted use

pesticides and the planting of genetically modified crops.

As discussed in detail below, the Court concludes that Ordinance 960 is

preempted by state law and is therefore invalid.   This decision in no way diminishes

the health and environmental concerns of the people of Kauai.   The Court's ruling

simply recognizes that the State of Hawaii has established a comprehensive

framework for addressing the application of restricted use pesticides and the

planting of GMO crops, which presently precludes local regulation by the County.

## FACTUAL BACKGROUND

Ordinance 960, previously designated Bill 2491, is now codified as

Kauai County Code ("KCC") § 22-23 et seq. (2014).   The stated purpose of the

Ordinance "is to establish provisions to inform the public, and protect the public

from any direct, indirect, or cumulative negative impacts on the health and natural

environment of the people and place of the County."   KCC § 22-23.2.

Ordinance 960 contains four operative provisions that impose various

notification requirements on commercial agricultural entities, create pesticide buffer

---

[2]  A list of each Motion presently before the Court is located in the Conclusion section of this
Order.   In addition to Motions for Summary Judgment, two Motions to Strike are also before the
Court.   The Court heard these Motions on July 23, 2014.

zones, mandate a County Environmental and Public Health Impact Study

("EPHIS"), and provide penalties for non-compliance.   First, section 22-23.4

requires the mandatory disclosure of the use of "restricted use pesticides" ("RUP")[3]

and the possession of GMOs by "commercial agricultural entities" ("CAE").[4]   The

pesticide disclosure provision requires CAEs that purchased or used in excess of five

pounds or fifteen gallons of any single RUP during the prior calendar year to make

disclosures relating to worker protection and pre- and post-application of RUPs.

KCC § 22-23.4(a).   In regard to worker protection, CAEs are required to post

warning signs that comply with Environmental Protection Agency ("EPA")

guidelines twenty-four hours prior to the application of a pesticide, during

application, and after application for the "restricted-entry period" established by the

EPA.   KCC § 22-23.4(a)(1).   The pre-application provision requires weekly

"Good Neighbor" notices be sent to any "requesting" persons within 1,500 feet of

the property where the pesticide will be applied that includes:   the pesticide to be

---

[3]   A "restricted use pesticide" is one that, when applied according to directions, "may generally cause, without additional regulatory restrictions, unreasonable adverse effects on the environment, including injury to the applicator."   7 U.S.C. § 136a(d)(C).   Pursuant to Hawaii Administrative Rules ("HAR") § 4-66-32, the State may classify a pesticide as an RUP if it is "determined to be a health hazard" or can "reasonably be anticipated to result in contamination of groundwater or significant reduction in non-target organisms, or fatality to members of endangered species." HAR § 4-66-2(b)(2), (3).

[4]   A "commercial agricultural entity" is defined as "a firm, corporation, association, partnership, or any organized group of persons, whether incorporated or not, that is engaged in growing, developing, cultivating, or producing agricultural products."   KCC § 22-23.3.

used; the active ingredient; date; time; and field number. KCC § 22-23.4(a)(2).

Finally, CAEs are required to make weekly post-application public disclosure

reports regarding the actual application of pesticides during the prior week.

KCC § 22-23.4(a)(3). The post-application report shall contain: the date and time

of application; field number; total acreage; trade name of the pesticide used; EPA

registration number; active ingredient; gallons or pounds used; temperature; wind

direction; and wind speed. Id.

   The GMO notification provision requires CAEs to make annual public

reports to the County Office of Economic Development ("OED") disclosing the

growing of GMOs. KCC § 22-23.4(b). These annual reports shall include a

general description of each GMO (e.g. "GMO corn"), a general description of its

geographic location, including at minimum the tax map key and ahupua`a, and the

dates that each GMO crop was introduced to the land in question.

KCC § 22-23.4(b)(2).

   The buffer zone provision requires CAEs that purchased or used in

excess of five pounds or fifteen gallons of any single RUP during the prior calendar

year to establish pesticide buffer zones between crops to which restricted use

pesticides are applied and surrounding properties. KCC § 22-23.5(a). The size of

the required buffer zone varies depending on the type of neighboring property in

question.   For example, a 500 foot buffer zone is required for schools and most dwellings, while a 100 foot buffer zone is required for roadways, shorelines, or waterways that flow into the ocean.   KCC §§ 22-23.5(a)(1)-(5).

Third, the County is required to complete an EPHIS to address "environmental and public health questions related to large scale commercial agricultural entities utilizing pesticides and genetically modified organisms."   The EPHIS "may make recommendations that include, but are not limited to, possible actions the County may take in order to address any significant effects, public health impacts, or both."   KCC § 22-23.6.

Finally, the penalty provision provides that "any person, firm, or corporation" violating the provisions of the Ordinance "shall be assessed a civil fine of $10,000-$25,000 per day, per violation."   KCC § 22-23.7(a).   In addition to the civil penalty, any violator "shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than two-thousand dollars ($2,000.00), or imprisoned not more than one (1) year, or both, for each offense. The continuance of any violation after conviction shall be deemed a new criminal offense for each day that the violation or violations continues."   KCC § 22-23.7(b).

Originally scheduled to take effect on August 16, 2014, the Court approved a stipulation by the parties extending the effective date and

implementation of Ordinance 960 to October 1, 2014, "unless otherwise ordered by this Court." (Doc. 84.)

## STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact, and that the undisputed facts warrant judgment for the moving party as a matter of law. See Fed. R. Civ. P. 56(c). In assessing whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 2000). However, the non-moving party cannot rely upon conclusory allegations unsupported by factual data to create an issue of material fact. Hansen v. U.S., 7 F.3d 137, 138 (9th Cir. 1993).

In deciding a motion for summary judgment, the court's function is not to try issues of fact, but rather, it is only to determine whether there are issues to be tried. Anderson, 477 U.S. at 249. If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

<u>DISCUSSION</u>

I.   COUNTY LEGISLATIVE AUTHORITY AND PREEMPTION OF
     PESTICIDE PROVISIONS UNDER STATE LAW (CLAIM 1)

        Plaintiffs' first Claim presents three arguments.   First, Plaintiffs assert

that the County lacks the legislative authority to enact an ordinance regulating the

field of agriculture.   Plaintiffs argue that Article XI § 3 of the Hawaii Constitution

and the various state statutes enacted to further the mandate of Article XI § I,

including HRS § 141 et seq., establishing the Department of Agriculture and HRS §

165-3, the Hawaii Right to Farm Act, vest exclusive authority over agriculture in the

State.[5]   (Doc. 98 at 5-6.)   Second, Plaintiffs contend that the pre- and

post-application disclosure requirements for RUPs and the pesticide buffer zone

provisions of Ordinance 960 are preempted by Hawaii Pesticides Law, HRS Chapter

149A.   Plaintiffs assert that HRS Chapter 149A and its implementing regulations

set out a "comprehensive, statewide statutory scheme for the regulation of

_____

[5]   Article XI § 3 provides,

        The State shall conserve and protect agricultural lands, promote diversified
        agriculture, increase agricultural self-sufficiency and assure the availability of
        agriculturally suitable lands.   The legislature shall provide standards and criteria to
        accomplish the foregoing.

        Lands identified by the State as important agricultural lands needed to fulfill the
        purposes above shall not be reclassified by the State or rezoned by its political
        subdivisions without meeting the standards and criteria established by the
        legislature and approved by a two-thirds vote of the body responsible for the
        reclassification or rezoning action.

pesticides" that "leaves no room for counties to interfere with pesticide regulation." Third, Plaintiffs assert that the annual GMO notification provision in Ordinance 960 is preempted by an array of state statutes regulating the introduction of plants and noxious weeds into the State.

In regard to the issue of authority, the County and Intervenors argue that the absence of an express mention of "counties" in Article XI § 3, or in the various statutes enacted to effectuate the State's constitutional concern for preserving agriculture land and promoting agriculture, does not eliminate the County's broad authority to act to protect health, life, and property pursuant to HRS § 46-1.5(13), or the County's constitutional obligation to protect public trust resources. As to preemption by state pesticide law, the County and Intervenors argue that the state statutory scheme is limited in its scope and does not cover the same subject matter as Ordinance 960, leaving room for County regulation regarding pesticide notification and buffer zones. As to preemption of the annual GMO notification provision, the County argues that state statutes relating to the introduction, propagation, and quarantine of plants do not regulate GMOs and therefore neither expressly nor impliedly preempt the County from imposing a GMO notification requirement.

A. The County Has the Authority to Enact Regulations Relating to Agricultural Activities

Hawaii counties are creations of the State. See Application of Anamizu, 481 P.2d 116, 118 (Haw. 1971). Article VIII, § 1 of the Hawaii Constitution provides that the "legislature shall create counties, and may create other political subdivisions within the State, and provide for the government thereof. Each political subdivision shall have and exercise such powers as shall be conferred under general laws." Thus, the Hawaii Constitution authorizes the state legislature to create the counties and to grant the counties such power as the state legislature deems necessary by statute.[6] See Marsland v. First Hawaiian Bank, 764 P.2d 1228, 1232 (Haw. 1988).

Accordingly, the power of the counties to enact laws or ordinances does not arise from any inherent authority, but rather is granted by the State.[7] Although many statutes confer authority to counties regarding specific topics, the general powers of the counties and limitations of the counties' powers are enumerated in

---

[6] Article VIII, section 2 of the Hawaii Constitution provides that the political subdivisions created by the state "shall have the power to frame and adopt a charter for its own self-government within the limits and under such procedures as may be provided by law." Accordingly, the counties' power to structure their respective governments is constitutional rather than purely statutory. This is an exception to the general rule that the authority of the counties is granted by statute.

[7] This majority view of limited local governmental authority, in which towns, counties and other municipal corporations have only the power conferred to them by the state, is known as Dillon's Rule, after Judge Dillon who authored the treatise, "Municipal Corporations." See Merrill v. Town of Monticello, 138 U.S. 673, 681 (1891). This theory of limited local government stands in contrast to the Cooley Doctrine, which views local governmental authority as inherent rather than delegated power arising from local self-determination and popular sovereignty. See People ex. rel. Le Roy Hurlburt, 24 Mich. 44, 108 (Mich. 1871) (Justice Cooley dissenting).

HRS § 46-1.5, which lists twenty-seven separate topic areas where counties are expressly granted authority.   Examples of express powers granted include:   the power of condemnation by eminent domain, HRS § 46-1.5(6); the power to make contracts HRS § 46-1.5 (4); the power to prevent or remove public nuisances HRS § 46-1.5 (12); and the power to establish and maintain waterworks and sewer works HRS § 46.1(23).

The general police powers of the counties are granted in HRS § 46-1.5(13), which provides:

> Each county shall have the power to enact ordinances deemed necessary to protect health, life, and property, and to preserve the order and security of the county and its inhabitants on any subject or matter not inconsistent with, or tending to defeat, the intent of any state statute where the statute does not disclose an express or implied intent that the statute shall be exclusive or uniform throughout the State[.]

It is this general statutory grant of authority to "protect health, life, and property," along with a Constitutional mandate to protect the public trust pursuant to art. XI § 1 that the County invoked when it enacted Ordinance 960.[8]

---

[8] Haw. Const. art. XI, § 1, provides,

> For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the

The fact that the state Constitution declares agriculture to be of statewide concern, does not by itself preclude all county regulation in the entire field of agriculture, or trigger a requirement that the State must expressly grant the counties specific authority in the area of agriculture. Indeed, art. IX § 1 states "the state shall provide for the protection and promotion of public health," and art. IX § 5 provides that housing is of "statewide concern." Neither constitutional provision indicates that the counties have any role to play, but this does not preclude the counties from enacting ordinances affecting either area where an ordinance falls under the counties' generally granted powers. See Richardson v. City & County of Honolulu, 868 P.2d 1193, 1212-13 (Haw. 1994) (effectively holding that counties may still have authority to regulate in areas of statewide concern absent some additional basis for preemption).

Moreover, HRS § 205-43, a portion of the state land use law enacted to effectuate the mandate to preserve agricultural lands propounded in art. XI § 3, expressly recognizes that counties have a role to play in formulating "agricultural policies, tax policies, land use plans, ordinances, and rules" to promote the long-term viability of agricultural use of important agricultural lands. Accordingly,

_____

self-sufficiency of the State. All public natural resources are held in trust by the State for the benefit of the people.

the legislature has expressly recognized that the counties have some role to play in enacting regulations that affect the field of agriculture. This conclusion that the County has some authority in the area of agriculture is, however, only the first step in the required analysis of County police power under HRS § 46-1.5(13).

B. **HRS § 149A Impliedly Preempts the Aspects of Ordinance 960 Pertaining to Pesticide Regulation**

In addition to empowering county governments, "HRS § 46–1.5(13) was intended to be a provision mandating the preemption of any ordinance that either conflicted with the intent of a state statute or legislated in an area already staked out by the legislature for exclusive and statewide statutory treatment." Richardson, 868 P.2d at 1207. "A test to determine whether an ordinance conflicts with a statute is whether it prohibits what the statute permits or permits what the statute prohibits." Waikiki Resort Hotel v. City & County of Honolulu, 624 P.2d 1353, 1366 (Haw. 1981).

Plaintiffs argue that Ordinance 960 directly conflicts with state law in two instances. First, Plaintiffs assert that the pesticide notification requirements of Ordinance 960 directly conflict with HRS § 149A-31.2, which states that the Department of Agriculture "shall publish on its website the public information contained in all restricted use pesticide records, reports, or forms submitted to the department, except those records, reports or forms . . . protected by section 92F-13."

Plaintiffs contend that Ordinance 960 lacks the protections granted by

HRS § 92F-13 and therefore directly conflicts with state law.[9]

Section 92F-13, sets out exceptions to the general rule of public access

to government records under the Uniform Information Practices Act ("UIPA"), and

addresses the non-disclosure of certain types of government records. Although

Plaintiffs make generic reference to "trade secrets" and "confidential business

information," they have not identified any specific information that would be

disclosed pursuant to Ordinance 960 in violation of section 92F-13. Lacking a

specific claim that information protected by section 92F-13 will be disclosed under

Ordinance 960, the absence of similarly protective language in the Ordinance is of

little consequence. The Court cannot find that Ordinance 960 prohibits what

---

[9] HRS § 92F-13 provides:

> This part shall not require disclosure of:
> (1) Government records which, if disclosed, would constitute a clearly unwarranted invasion of personal privacy;
> (2) Government records pertaining to the prosecution or defense of any judicial or quasi-judicial action to which the State or any county is or may be a party, to the extent that such records would not be discoverable;
> (3) Government records that, by their nature, must be confidential in order for the government to avoid the frustration of a legitimate government function;
> (4) Government records which, pursuant to state or federal law including an order of any state or federal court, are protected from disclosure; and
> (5) Inchoate and draft working papers of legislative committees including budget worksheets and unfiled committee reports; work product; records or transcripts of an investigating committee of the legislature which are closed by rules adopted pursuant to section 21-4 and the personal files of members of the legislature.

section 92F-13 permits or permits what the statute prohibits.[10]

Second, Plaintiffs assert that, to the extent the County relied upon its authority to regulate nuisance under HRS § 46-1.5 (12), the Hawaii's Right to Farm Act, HRS § 165-1 et seq., expressly precludes the County from enacting legislation that regulates agriculture as a nuisance. As discussed below, the Court finds that Ordinance 960 does not conflict with the Right to Farm Act.

The Right to Farm Act is concerned with nuisance lawsuits against farmers arising from the increasing urbanization of traditionally agricultural areas of the State. See Hse. Stand Com. Rpt. No. 1307 on SB45 (2001). As such, the substantive provisions of the statute are essentially burden shifting, providing for a rebuttable presumption that "generally accepted agricultural and management practices" do not constitute a nuisance. HRS § 165-4. Accordingly, the Right to Farm Act does not categorically preclude nuisance lawsuits, nor preclude a legislative body or court from concluding that a particular practice constitutes a nuisance. Rather, the Act only establishes a rebuttable presumption against a nuisance claim that would then need to be tested during a factual analysis.

---

[10] Notably, though not determinative of the legal issue at hand, the Hawaii Attorney General issued an opinion in 1992 holding that the public release of a certified pesticide applicator's personal information including name, business address even when a home address is used as a business address, category of certification, and status of certification did not constitute a "clearly unwarranted invasion of personal privacy" under UIPA. OIP Ltr. 92-18, 1992 WL 454997 (Sept. 16, 1992).

Lacking a direct conflict between Ordinance 960 and any state law cited by the Plaintiffs, the Court must next analyze whether the Ordinance legislates "in an area already staked out by the legislature for exclusive and statewide statutory treatment." Richardson, 868 P.2d at 1207. Whether an ordinance impermissibly enters an area of exclusive and statewide statutory treatment may be measured by the "comprehensive statutory scheme test." Id. at 1208. Under this test, the "critical determination to be made" is whether the statutory scheme at issue indicates a legislative intention, either express or implied, to be exclusive and uniform throughout the state." Id. at 1209.

The first step of this test is to examine whether the local ordinance in question covers the same subject matter embraced by state law or regulations. See State v. Ewing, 914 P.2d 549, 554 (Haw. Ct. App. 1996). Only upon a finding of overlapping subject matter would a court then proceed to analyze the uniformity and exclusivity of a statutory scheme. See Citizens Utilities Co. v. County of Kauai, 814 P.2d 398, 400 (Haw. 1991) ("a municipal ordinance, which covers the same subject matter embraced within a State statute is invalid if the statute discloses an express or implied intent that the same shall be exclusive, or uniform in application throughout the State") (quoting In re Application of Anamizu, 481 P.2d 116 (Haw. 1971) .

In <u>Anamizu</u>, for example, the Hawaii Supreme Court considered whether a city ordinance establishing licensing requirements for electrical contractors over and above those established under state law was preempted.   The court held that HRS § 444 pertaining to contractors, had established a "comprehensive statutory scheme for regulating the contracting business within the State of Hawaii."   <u>Anamizu</u>, 481 P.2d at 118.   The State required "all persons" who wished to engage in contracting to obtain a state license issued by the state licensing board, vested the board with broad powers to regulate contractors including the power to promulgate regulations, empowered the board to "investigate, classify, and qualify applicants," and to discipline those who proved incompetent of unworthy.   <u>Id.</u>   According to the court, the "pervasiveness" of the State's "comprehensive regulatory scheme" necessarily implied that a person satisfying the state standards acquired permission to pursue his occupation that could not be circumscribed by local authorities.   <u>Id.</u> at 119.

Twenty years later, in <u>Citizens Utilities Co.</u>, the Hawaii Supreme Court considered the preemptive force of HRS § 269 et seq., establishing the Public Utilities Commission ("PUC"), in the face of a Kauai County Ordinance seeking to limit the height of utility poles.   In light of HRS § 269-6, which provides that the PUC "shall have the general supervision . . . over all public utilities" and PUC

General Order No. 6 governing overhead line construction and pole height, the court held "it is clear that the legislature intended to reserve with the PUC the regulatory powers over public utilities, which was a matter of statewide concern to the legislature, and has preempted the power of the counties to regulate the height of utility poles." Citizens Utilities, 814 P.2d at 400. To allow the county to regulate pole height "would be inconsistent with the intent of the statutory language expressly authorizing the PUC to supervise and regulate public utilities." Id.

Returning to the case before the Court, Ordinance 960 regulates pesticides in two ways. First, it imposes various pre- and post-application reporting requirements. Second, it establishes an array of pesticide buffer zones in which no crops to which pesticides would be applied may be planted. Accordingly, the "subject matters" regulated by Ordinance 960 are record keeping and reporting, and areas of permissible planting and associated pesticide use.

Part III of the Hawaii Pesticide Law addresses pesticide use including record keeping and reporting. See HRS §§ 149A-31 through 149A-37. HRS § 149A-32.5 vests the chairperson of the board of agriculture, in consultation with an advisory committee and with the approval of the director of health, with the authority to "suspend, cancel, or restrict the use of certain pesticides or specific uses of certain pesticides when the usage is determined to have unreasonable adverse

effects on the environment." HRS § 149A-33 provides that the State Department of Agriculture ("DOA") "shall have the authority to carry out and effectuate" the purpose of this chapter by rulemaking including but not limited to: (1) establishing the "limitations and conditions for the application of pesticides by aircraft, power rigs, mist blowers, or other equipment;" (2) establishing, "as necessary, specific standards and guidelines which specify those conditions which constitute unreasonable adverse effects on the environment;" and (3) establishing "as necessary, record keeping requirements for pesticide use by applicators." HRS § 149A-31.2(a) further addresses pesticide record keeping, providing that "the department shall publish on its website the public information contained in all restricted use pesticide records, reports, or forms submitted to the department. . . ."

The DOA's administrative rules pertinent to pesticide regulation are set forth in HAR § 4-66 et seq. Section 4-66-23 provides for pesticide labeling and directions for use. It provides that labels shall include "limitations or restrictions on use required to prevent unreasonable adverse effects on humans or the environment," including use "in or adjacent to certain areas." HAR § 4-66-23(9)(c). Section 4-66-32.1, titled "evaluation of pesticide uses," provides that the head of the DOA shall investigate any reports that a pesticide "may have caused, or is likely to cause, unreasonable adverse effects to humans or the

environment." HAR § 4-66-32.1(a). Where such investigations identify "unreasonable adverse effects," the head "shall" conduct an evaluation of the pesticide and may impose regulations to mitigate unreasonable adverse effects, impose restrictions on use, or cancel or suspend a pesticide license.

HAR § 4-66-32.1(c) Section 4-66-62 sets out the requirements for certified pesticide applicator record keeping and provides that "certified pesticide applicators shall keep records of all applications" of RUPs at their principle place of business for two years including: product name, EPA registration number, active ingredient, name of target pest, dilution rate, total amount used, total area covered, time and date of application, location, name of applicator, crop, restricted entry level, and any other information the head deems necessary. HAR § 4-66-62(b).

Though not utilizing the specific phrase "buffer zones," the state regulatory framework expressly addresses the DOA's role in determining unreasonable adverse effects of pesticide use including the use "in or adjacent to certain areas." Additionally, state law expressly sets out reporting requirements surrounding the use of RUPs. Accordingly, the Court finds that the statutory scheme and associated administrative rules cover the same subject matter as Ordinance 960.

The Court also finds that the state regulatory framework creates a

global or comprehensive mechanism for regulating pesticide licensing, sales, use, and enforcement within the State.   See Richardson, 868 P.2d at 2018.   This comprehensive scheme, when viewed in the context of statewide constitutional concern for agriculture set out in art. XI § 3 and the administrative structures established in the DOA and Department of Health to effectuate the regulation of pesticides, evidences the legislature's intent that state law be both uniform and exclusive.

The Board of Agriculture is vested with the authority to adopt uniform rules to "establish a system of control over the distribution and use of certain pesticides."   HRS § 149A-19(a)(1).   HRS § 149A-51 establishes an advisory committee of stakeholders to advise and assist the DOA in developing or revising laws and rules to carry out and effectuate the purposes of this pesticide law and in advising the DOA in pesticide problems.   The DOA is granted the authority to enter upon any public or private property to carry out inspections to carry out the purposes of chapter 149A.   HRS § 149A-36.   And the DOA is vested with the authority to levy administrative and criminal penalties for failure to adhere to the pesticide law.   HRS § 149A-41.   That counties and local governments are wholly absent from this framework of rulemaking, oversight, and enforcement evidences the legislature's intent that the State have exclusive authority over pesticide regulation.

Accordingly, the Court holds that the pesticide provisions of Ordinance 960 are preempted by state law and are barred from taking effect.

C.    State Laws Impliedly Preempt Annual GMO Reporting Requirements

Ordinance 960 requires Plaintiffs to submit annual reports that shall include a general description of each GMO grown (e.g. "GMO corn"), a general description of its geographic location including at minimum the tax map key and ahupua`a, and the date each GMO crop was introduced to the land in question. KCC § 22-23.4(b)(2).   This provision is premised in part upon the finding that GMO crops could have negative "environmental and economic impacts" due to seed and pollen transfer, see KCC § 22-23.1(f), and in part due to the pesticide use associated with these crops.

Plaintiffs claim that the field of GMO regulation is fully occupied by state statutory law thereby preempting this local regulation.   Plaintiffs specifically point to HRS § 141-2 setting out the Department of Agriculture's rulemaking authority, HRS § 147-121 designating the DOA as the official certifying agency with regard to certifying seed genetic purity, identity, and quality, HRS § 150A concerning plant quarantine, and HRS § 152-2 and HAR § 4-68-6 laying out the law and regulations for the control of noxious weeds.   As with pesticide regulation, the court must inquire "whether the statutory scheme at issue indicates a legislative

21

intention, either express or implied, to be exclusive and uniform throughout the state." Richardson, 868 P.2d at 1209.

The DOA is vested with rulemaking authority concerning, in relevant part, the introduction of plants into the State, the quarantine or exclusion of plants "at any time or place within the state," and the manner in which agricultural research activities may be undertaken. See HRS § 141-2. Pursuant to the Hawaii Plant Quarantine Law, the DOA is charged with designating "restricted plants" that "may be detrimental or potentially harmful to agriculture, horticulture, the environment, or animal or public health." HRS § 150A-6.1. Additionally, the quarantine law, like the pesticide law, provides for an advisory committee charged with advising the DOA in problems relating to the "introduction, confinement, or release of plants, animals, and microorganisms" throughout the State. HRS § 150A-10. Related to the DOA's authority to designate "restricted plants" in relation to importation, the Department is also vested with the authority to designate, control, and eradicate "noxious weeds" which "may be likely to become, injurious, harmful, or deleterious to the agricultural, horticultural, aquacultural, or livestock industry of the State and to forest and recreational areas and conservation districts of the State." HRS § 152-1.

Although these provisions relating to the identification of plants that

may be harmful to the environment do not speak to reporting requirements for

growing GMO crops, they do set out the State's role in identifying potentially

harmful plants, which is precisely what the County reporting requirement is

premised upon.   As with the foregoing discussion of the state pesticide law, the

Court finds that these statutory provisions, in the context of art. XI § 3, the

comprehensive administrative system established under the DOA, and the complete

absence of reference to counties or local government therein evidence the

legislature's intent that the state scheme for the regulation of specific potentially

harmful plants be both uniform and exclusive preempting the imposition of local

regulations on this specific issue.   Accordingly, the Court holds that the GMO

notification provision of Ordinance 960 is preempted by state law and is barred from

taking effect.

II.    FEDERAL PREEMPTION OF THE NOTIFICATION PROVISIONS
       APPLICABLE TO GMO CROPS AND PESTICIDES (CLAIM 3)

            Plaintiffs' third claim has two parts.   First, Plaintiffs contend that the

Federal Insecticide Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136i-1(b),

expressly preempts some of the informational requirements of Ordinance 960.

Second, Plaintiffs assert that a "federal coordinated framework" comprehensively

regulates GMOs thereby impliedly preempting state or county regulation in the

area.[11]  The County and Intervenors argue that FIFRA does not prevent the State or

counties from imposing stricter disclosure requirements than under federal law.

Additionally, the County and Intervenors argue that federal GMO regulations allow

for parallel regulation by states and their political subdivisions.

"It is a familiar and well-established principle that the Supremacy

Clause, U.S. Const., art. VI, cl. 2, invalidates state laws that interfere with, or are

contrary to, federal law."  Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.,

471 U.S. 707, 712 (1985).  That said, "preemption analysis begins with the

presumption that Congress does not intend to supplant state law."  Tillison v.

Gregoire, 424 F.3d 1093, 1098 (9th Cir. 2005).  "State laws can be pre-empted by

federal regulations as well as by federal statutes."  Hillsborough, 471 U.S. at 713.

"For the purposes of the Supremacy Clause, the constitutionality of local ordinances

is analyzed in the same way as that of statewide laws."  Id.

"Congress has the constitutional power to preempt state law, and may

do so either expressly—through clear statutory language—or implicitly."  Whistler

Invs., Inc. v. Depository Trust & Clearing Corp., 539 F.3d 1159, 1164 (9th Cir.

2008) (internal citation omitted).  Where Congress does expressly supersede state

---

[11]  The Court notes that Plaintiffs' state and federal preemption claims as to the GMO provisions of
Ordinance 960 are mutually exclusive.  It cannot be the case that the field of GMO regulation is
fully occupied by state statutory law, and that a "federal coordinated framework" comprehensively
regulates GMOs thereby preempting state or county regulation in the area.

legislation by statute, a court's task is to "identify the domain expressly pre-empted." Dan's City Used Cars, Inc. v. Pelkey, 133 S. Ct. 1769, 1778 (2013). Where Congress enacts a provision expressly defining the preemptive reach of a statute, matters beyond the reach of the provision are impliedly not preempted. See Cipollone v. Liggett, Inc., 505 U.S. 504, 517 (1992).

In the absence of express preemptive language, however, Congress' intent to preempt state law in a particular area may be inferred in two instances. First, under the doctrine of field preemption, a state law will be preempted where federal law "so thoroughly occupies a legislative field as to make reasonable the inference that congress left no room for the States to supplement it," or where "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Cipollone, 505 U.S. at 516 (internal quotes and citations omitted).

Second, under the doctrine of conflict preemption, "state law is nullified to the extent that it actually conflicts with federal law," such that "compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hillsborough, 471 U.S. at 713 (internal quotes omitted). The determination of whether preemptive conflict exists between

federal and state law "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000).

"In considering the preemptive scope of a statute, congressional intent is the ultimate touchstone." Mickey Lee Dilts, et al v. Penske Logistics, et al, No. 12-55705, 2014 WL 3291749, at *8 (9th Cir. July 9, 2014). Congressional intent is primarily discerned from the language of the statute in question and the statutory framework surrounding it, the structure and purpose of the statute as a whole, and "the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." Medtronic, Inc. v. Lohr, 518 U.S. 470, 486 (1996).

A. Express Preemption Provision in FIFRA Does Not Preempt Ordinance 960

Ordinance 960 requires public pre-application notices and post-application reports of pesticide applications, which include the "field number" where the pesticide will be, or has been applied. Generally, FIFRA permits states, and by extension their political subdivisions with delegated authority, to regulate the sale or use of pesticides provided that states do not permit sales or uses prohibited under federal law. See 7 U.S.C. § 136v; see also Wisconsin Public Intervenor v. Mortier, 501 U.S. 597, 608 (1991) (holding that FIFRA does not preempt local

regulation of the sale and use of pesticides where a state has allocated authority to its

political subdivisions).   Despite this general lack of preemptive force, Plaintiffs

assert that specific privacy protections within FIFRA, 7 U.S.C. § 136i-1(b), bar the

County from publicizing the locations of pesticide application.   In support,

Plaintiffs cite John Doe #1 v. Veneman, 380 F.3d 807, 817 n.38 (5th Cir. 2004),

which upheld a lower court injunction prohibiting the USDA from releasing

personal information of RUP applicators in connection with a Freedom of

Information Act request.

      As discussed below, the Court finds that the privacy provisions of

FIFRA do not preempt separate and independent state or local pesticide reporting

requirements.   Veneman, which barred the release of identifying information, is

distinguishable from this case because it dealt with information collected by federal

agencies pursuant to 136i-1(a).   The informational requirements at issue in this

case, on the other hand, are not imposed pursuant to section 136i-1(a).

      Section 136i-1 of FIFRA addresses pesticide record keeping.   Section

136i-1(a), provides that the Secretary of Agriculture "shall require" certified

applicators of RUPs to maintain records "comparable to records maintained by

commercial applicators of pesticides in each State."   Where states lack record

keeping requirements, section 136i-1(a) requires applicators to maintain records of

pesticide use including product name, amount used, date of application, and location

of application. Accordingly, section 136i-1 establishes a federal record keeping

requirement parallel to any record keeping requirement imposed under state law, or,

where states lack any reporting requirements, establishes a federal record keeping

standard.

Section 136i-1(b), in turn, governs access to the records "maintained

under subsection (a)" and provides that the records "shall be made available to any

Federal or State agency that deals with pesticide use or any health or environmental

issue related to the use of pesticides. . . ." Section (b) also provides, however, that

"in no case may a government agency release data, including the location from

which the data was derived, that would directly or indirectly reveal the identity of

individual producers."[12] 7 U.S.C. § 136i-1(b). Accordingly, no federal or state

agency that accesses pesticide use information that is maintained pursuant to the

federal record keeping requirement in section 136i-1(a) may release information

_____

[12] The Definitions section of FIFRA, 7 U.S.C. § 136(w), states:

> The term "producer" means the person who manufactures, prepares,
> compounds, propagates, or processes any pesticide or device or active
> ingredient used in producing a pesticide. The term "produce" means to
> manufacture, prepare, compound, propagate, or process any pesticide or
> device or active ingredient used in producing a pesticide. The dilution by
> individuals of formulated pesticides for their own use and according to the
> directions on registered labels shall not of itself result in such individuals
> being included in the definition of "producer" for the purposes of this
> subchapter.

regarding location of use that would reveal the identity of individual producers. This restriction on access to information would not, however, apply to pesticide record keeping mandated by separate and independent state record keeping schemes, because state records are not "maintained under subsection (a)."

That FIFRA envisions independent federal and state record keeping requirements is further buttressed by other provisions in the statutory scheme. First, section 136i-1(e) provides that "the requirements of this section shall not affect provisions of other Federal or State laws."   Second, the federal record keeping requirement mandated by section 136i-1(a) does not, apply to "private applicator(s)" of restricted use pesticides.   7 U.S.C. § 136i ("no regulation prescribed . . . for carrying out the provisions of this subchapter shall require any private applicator to maintain any records or file any reports or other documents").[13]   Federal regulations, however, expressly recognize that states "may, on their own authority, require private applicator record keeping."   Recordkeeping Requirements for Certified Applicators of Federally Restricted Use Pesticides, 58 Fed Reg. 19014-01, 19015 (April 9, 1993) (to be codified at 7 C.F.R. pt. 110).   If the Plaintiffs in this case are private applicators, it would appear that FIFRA imposes no reporting requirements on them, and by extension, no restrictions on access to information.   If

---

[13]  A private applicator is defined as a "certified applicator" who uses RUPs for "producing any agricultural commodity on property owned or rented by the applicator."   7 U.S.C. § 136(e)(2).

the Plaintiffs are commercial applicators, FIFRA does impose reporting requirements but they would be independent of any state requirements.  And, as discussed previously in relation to express state preemption of pesticide notification premised upon UIPA, location information including pesticide applicator addresses is likely not protected information under state law.  <u>See</u> n.10 of this Order.

In sum, the Court reads 7 U.S.C. 136i-1(b) as imposing informational restrictions only on records maintained pursuant to 136i-1(a).  Because Ordinance 960 imposes record keeping requirements pursuant to a separate and independent state power, FIFRA's restriction pertaining to location information does not apply.

B.      Federal Preemption of GMO Regulation

The GMO notification provision of Ordinance 960 requires commercial agricultural entities to provide "annual public reports" to the County Office of Economic Development and the State of Hawaii Department of Agriculture, disclosing the growing of GMOs no later than 60 days following the end of each calendar year.  KCC §§ 22-23.4(b), (b)(1).  These annual reports shall include a "general description" of each GMO, a "general description of the geographic location including at minimum the Tax Map Key or ahupua`a" where each GMO is being grown or developed, and the dates that each GMO was initially introduced to the land in question.  KCC § 22-23.4(b)(2).

Plaintiffs assert that the GMO reporting requirements in Ordinance 960 are preempted by a "Federal Coordinated Framework," which includes regulation of GMOs by the DOA's Animal and Plant Health Inspection Service ("APHIS") pursuant to the Federal Plant Protection Act ("PPA"), 7 U.S.C. § 7701 et seq. Although Plaintiffs do not clearly state the nature of federal preemption asserted, the Court interprets Plaintiffs' Motion to argue both express preemption and conflict preemption.

As to express preemption, Plaintiffs argue that 7 U.S.C. § 7756(b)(1) expressly precludes state regulation of GMO crops. (Doc. 47-1 at 37.) As to conflict preemption, Plaintiffs appear to argue that the state regulation of GMO crops conflicts with federal APHIS permits granted to Plaintiffs to conduct field trials. (Id. at 38.) Plaintiffs assert that they have a federal right to conduct field trials in conformance with the APHIS regulations permitting them. Plaintiffs further assert that Ordinance 960 interferes with the exercise of this federally protected right, contrary to the principles set out by Brown v. Hotel & Rest. Employees & Bartenders Int'l Union Local 54, 468 U.S. 491, 501 (1984) (holding generally that if employee conduct is protected under federal law, then state law which interferes with the exercise of such federally protected rights is preempted). (Id.)

1.  Express Preemption Under 7 U.S.C. § 7756(b)(1)

The PPA, 7 U.S.C. 7701 et seq., authorizes the Secretary of Agriculture to prohibit or restrict the importation or movement in interstate commerce of noxious weeds, which can directly or indirectly injure or cause damage to crops, public health, or the environment.   See Update of Noxious Weed Regulations, 75 FR 68945-01 (Nov. 10, 2010).   Pursuant to the PPA, a list of prohibited or restricted noxious weeds and noxious seeds are set out in 7 C.F.R. §§ 360.200 and 361.6 respectively.

Section 7756, titled "Preemption," provides

> no State or political subdivision of a State may regulate the movement in interstate commerce of any article, means of conveyance, plant, biological control organism, plant pest, noxious weed, or plant product in order to control a plant pest or noxious weed, eradicate a plant pest or noxious weed, or prevent the introduction or dissemination of a biological control organism, plant pest, or noxious weed, if the Secretary has issued a regulation or order to prevent the dissemination of the biological control organism, plant pest, or noxious weed within the United States.

7 U.S.C. § 7756(b)(1).   Pursuant to this express preemption provision, states or their political subdivisions are barred from regulating the interstate movement of any "plant, biological control organism, plant pest, noxious weed, or plant product" if the Secretary of Agriculture has issued a regulation or order to prevent the dissemination" of the same within the United States.   "Movement" is defined as,

among other things, "to release into the environment" or "to allow" release into the

environment.   See 7 U.S.C. 7702(9)(E).   Accordingly, section 7756(b)(1) prohibits

states and localities from releasing or permitting the release of plants that the

Secretary has expressly prohibited or restricted.

The annual GMO notification provision of Ordinance 960 does not

regulate the "movement" of any plant or noxious weed, nor permit anything that

federal law has proscribed.   It does not prevent Plaintiffs from importing, growing,

or exporting any GMO crop.   Accordingly, the Court finds that 7 U.S.C. §

7756(b)(1) does not preempt the annual GMO notification provision of Ordinance

960, KCC § 22-23.4(b).

2.   Conflict Between Ordinance 960 and APHIS Permits

Regulations in 7 C.F.R. § 340 et seq. address procedures for the

introduction of "genetically engineered organisms and products that are derived

from known plant pests (regulated articles)."   Genetically Engineered Organisms

and Products; Simplification of Requirements and Procedures for Genetically

Engineered Organisms, 62 FR 23945-01 (May 2, 1997).   To "introduce" a

regulated article under the regulations, a person must notify APHIS, or obtain a

permit from APHIS.   See 7 C.F.R. § 340.0(a)(1).   The notification process is a

simplified procedure available for certain plant species that are not listed as noxious

weeds, and meet other eligibility requirements, and the permitting process is a more involved method of approval.   See 62 FR 23945-01.

Under the notification process, the notifying party must provide APHIS with:   personal identifying information; information on the regulated article including scientific, common, or trade name and genetic information; the field site location and size; the date and duration of the proposed introduction; and an acknowledgment that the introduction will be conducted in accordance with the performance standards set out in the regulation.   See 7 C.F.R. § 340.3 (d)(2). Post-introduction, whether a GMO plant is introduced into the environment via the notification process or via permit, the party introducing the GMO is required to submit a "field test report" to APHIS within 6 months after termination of the field test regarding "all deleterious effects on plants, nontarget organisms, or the environment."   7 C.F.R. § 340.3(d)(4).

Plaintiffs assert that the annual GMO notification requirement under Ordinance 960 "conflicts with or frustrates the purposes" of the APHIS regulations governing field trials.   Particularly given the presumption against federal preemption of state law, the Court disagrees.   Plaintiffs have not shown that "compliance with both federal and state regulations is a physical impossibility," or that Ordinance 960 "stands as an obstacle to the accomplishment and execution of

the full purposes and objectives of Congress." Hillsborough County, Fla. 471 U.S. at 713.  The County's reporting requirement does not interfere with any of the pre- or post-introduction informational requirements of the APHIS field trial scheme, nor does the County's annual reporting requirement interfere with the conduct of field trials.  It is immaterial, and the Court need not address, whether a field trial permit issued by APHIS provides Plaintiffs with a "federal right" to plant GMO crops because the Plaintiffs' field trials are not precluded or hampered by the County's annual reporting requirement.

## III.    PLAINTIFFS' REMAINING CLAIMS

"It is a fundamental rule of judicial restraint that federal courts ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." Crowder v. Kitagawa, 81 F.3d 1480, 1486 (9th Cir. 1996) (internal quotations omitted); see also Gulf Oil Co. v. Bernard, 452 U.S. 89, 99 (1981) ("prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.").  Because the Court finds that Ordinance 960 is without effect due to state preemption, the Court refrains from addressing Plaintiffs' due process and equal protection claims.[14]  Similarly, in light of the

---

[14] Both Plaintiffs' and Intervenors' respective Motions to Strike various factual assertions in each other's Concise Statements relate to the question of whether or not the County had a rational basis for enacting Ordinance 960 under a due process analysis.  Because the Court refrains from addressing Plaintiffs' constitutional claims and therefore does not rely upon the factual assertions

conclusion that state law preempts Ordinance 960, the Court declines to address the summary judgment motions as to all of the remaining claims.

CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of Plaintiffs on Claim 1, concluding that Ordinance 960 it is preempted by state law and is therefore invalid. The Court grants summary judgment in the County and Intervenors' favor on Claim 3, holding that the Ordinance is not federally preempted. The Court declines to address the remaining Claims; Motions relating to the remaining Claims are denied as moot.

The Court rules on each pending Motion as follows:

- Plaintiffs' Motion for Partial Summary Judgment as to Claims Eleven, Twelve, and Thirteen of the First Amended Complaint (Doc. 45) – DENIED AS MOOT;

- Plaintiffs' Motion for Partial Summary Judgment as to Claims One, Three, Four, and Five Of First Amended Complaint (Doc. 47) – GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED to the extent that state law preempts Ordinance 960, DENIED as to federal preemption, and the Constitutional claims are DENIED AS MOOT;

- Defendant County of Kauai's Cross-Motion for Partial Summary Judgment as to Claims Eleven, Twelve, and Thirteen (Doc. 65) – DENIED AS MOOT;

- Defendant County of Kauai's Motion for Judgment on the

---

in either of the parties' Concise Statements, the Motions to Strike are denied as moot.

Pleadings or, in the Alternative, for Summary Judgment as to Plaintiffs' Second, Sixth, Seventh, Eighth, Ninth and Tenth Claims (Doc. 66) – DENIED AS MOOT;

- Defendant County of Kauai's Cross-Motion for Partial Summary Judgment as to Claims One, Three, Four and Five and, in the Alternative, to Certify a Question to the Hawaii Supreme Court (Doc. 68) – GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED as to federal preemption, DENIED as to state preemption, and DENIED AS MOOT as to the constitutional claims;

- Intervenor-Defendants' Cross-Motion for Partial Summary Judgment on Claims One, Three, Four, and Five (Doc. 71) – GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED as to federal preemption, DENIED as to state preemption, and DENIED AS MOOT as to the constitutional claims;

- Intervenors-Defendants' Cross-Motion for Partial Summary Judgment on Claims Eleven, Twelve, and Thirteen (Doc. 73) – DENIED AS MOOT;

- Intervenor-Defendants' Cross-Motion for Partial Summary Judgment on Claims Two, Six, and Eight (Doc. 75) – DENIED AS MOOT;

- Intervenor-Defendants' Joinder in Defendant County of Kauai's Motion for Judgment on the Pleadings or, in the Alternative, for Summary judgment, as to Plaintiffs' Seventh, Ninth, and Tenth Claims (Doc. 80) – DENIED AS MOOT;

- Plaintiffs' Motion to Strike (1) Intervenor-Defendants' Amended Concise Statement of Facts Relating to the Cross-Motions for Partial Summary Judgment on Claims One, Three, Four, and Five of the First Amended Complaint and (2) Unsupported Factual Claims in Intervenors/Defendants' Memoranda (Doc. 105) – DENIED AS MOOT;

- Intervenors' Motion to Strike Plaintiffs' Declaration of Harold H. Keyser, or in the Alternative, for Leave to File Declaration of Doug Gurian-Sherman, Ph.D., in Support of Intervenor-Defendants' Motion for Partial Summary Judgment on Claims One, Three, Four, and Five of the First Amended Complaint (Doc. 122) – DENIED AS MOOT.

The Court enjoins the County from implementing or enforcing Ordinance 960. This Order is dispositive of the case. Judgment shall be entered in favor of Plaintiffs and against Defendant County of Kauai and Intervenors.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 23, 2014.



  /S/ Barry M. Kurren
Barry M. Kurren
United States Magistrate Judge

Syngenta Seeds, Inc., et al. v. County Of Kauai, CV 14-00014 BMK, ORDER ON PREEMPTION AND ORDER ON VARIOUS MOTIONS.