| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF HAWAII |

| | | | |
|---|---|---|---|
| 3 | | | |
| | SYNGENTA SEEDS, INC.; | ) | CIVIL NO. 14-00014BMK |
| 4 | SYNGENTA HAWAII, LLC; | ) | |
| | PIONEER HI-BRED | ) | Honolulu, Hawaii |
| 5 | INTERNATIONAL, INC., an | ) | July 23, 2014 |
| | Iowan Corporation; and | ) | 1:01 p.m. |
| 6 | AGRIGENETICS, INC., a | ) | |
| | Delaware Corporation; BASF | ) | [45] PLAINTIFFS' MOTION FOR |
| 7 | PLANT SCIENCE LP, a | ) | PARTIAL SUMMARY JUDGMENT AS |
| | Delaware Limited | ) | TO CLAIMS ELEVEN, TWELVE, |
| 8 | Partnership, | ) | AND THIRTEEN OF THE FIRST |
| | | ) | AMENDED COMPLAINT |
| 9 | Plaintiffs, | ) | [47] PLAINTIFFS' MOTION FOR |
| | | ) | PARTIAL SUMMARY JUDGMENT AS |
| 10 | vs. | ) | TO CLAIMS ONE, THREE, FOUR, |
| | | ) | AND FIVE OF THE FIRST |
| 11 | COUNTY OF KAUAI, | ) | AMENDED COMPLAINT |
| | | ) | [63] DEFENDANT COUNTY OF |
| 12 | Defendant, | ) | KAUAI'S MOTION TO DISMISS |
| | | ) | FOR LACK OF JURISDICTION |
| 13 | and | ) | OR, IN THE ALTERNATIVE, FOR |
| | | ) | JUDGMENT ON THE PLEADINGS |
| 14 | KA MAKANI HO`OPONO, | ) | [65] DEFENDANT COUNTY OF |
| | CENTER FOR FOOD SAFETY, | ) | KAUAI'S CROSS-MOTION FOR |
| 15 | PESTICIDE ACTION NETWORK | ) | PARTIAL SUMMARY JUDGMENT AS |
| | NORTH AMERICA, and | ) | TO CLAIMS ELEVEN, TWELVE, |
| 16 | SURFRIDER FOUNDATION, | ) | AND THIRTEEN |
| | | ) | [66] DEFENDANT COUNTY OF |
| 17 | Intervenor- | ) | KAUAI'S MOTION FOR JUDGMENT |
| | Defendants. | ) | ON THE PLEADINGS OR, IN THE |
| 18 | | ) | ALTERNATIVE, FOR SUMMARY |
| | | ) | JUDGMENT AS TO PLAINTIFFS' |
| 19 | | ) | SECOND, SIXTH, SEVENTH, |
| | | ) | EIGHTH, NINTH AND TENTH |
| 20 | | ) | CLAIMS |
| | | ) | [68] DEFENDANT COUNTY OF |
| 21 | | ) | KAUAI'S CROSS-MOTION FOR |
| | | ) | PARTIAL SUMMARY JUDGMENT AS |
| 22 | | ) | TO CLAIMS ONE, THREE, FOUR |
| | | ) | AND FIVE AND, IN THE |
| 23 | | ) | ALTERNATIVE, TO CERTIFY A |
| | | ) | QUESTION TO THE HAWAII |
| 24 | | ) | SUPREME COURT |
| | | ) | [71] INTERVENOR-DEFENDANTS' |
| 25 | | ) | CROSS-MOTION FOR PARTIAL |
| | | ) | SUMMARY JUDGMENT ON CLAIMS |

```
 1                                    )   ONE, THREE, FOUR, AND FIVE
                                      )   OF THE FIRST AMENDED
 2                                    )   COMPLAINT
                                      )   [73] INTERVENOR-DEFENDANTS'
 3                                    )   CROSS-MOTION FOR PARTIAL
                                      )   SUMMARY JUDGMENT ON CLAIMS
 4                                    )   ELEVEN, TWELVE, AND
                                      )   THIRTEEN
 5                                    )   [75] INTERVENOR-DEFENDANTS'
                                      )   CROSS-MOTION FOR PARTIAL
 6                                    )   SUMMARY JUDGMENT ON CLAIMS
                                      )   TWO, SIX, AND EIGHT OF THE
 7                                    )   FIRST AMENDED COMPLAINT
                                      )   [80] INTERVENOR-DEFENDANTS'
 8                                    )   JOINDER IN DEFENDANT COUNTY
                                      )   OF KAUAI'S MOTION FOR
 9                                    )   JUDGMENT ON THE PLEADINGS,
                                      )   OR, IN THE ALTERNATIVE, FOR
10                                    )   SUMMARY JUDGMENT, AS TO
                                      )   PLAINTIFFS' SEVENTH, NINTH,
11                                    )   AND TENTH CLAIMS
                                      )   [105] PLAINTIFFS' MOTION TO
12                                    )   STRIKE (1) INTERVENOR/
                                      )   DEFENDANTS' AMENDED CONCISE
13                                    )   STATEMENT OF FACTS RELATING
                                      )   TO THE CROSS-MOTIONS FOR
14                                    )   PARTIAL SUMMARY JUDGMENT ON
                                      )   CLAIMS ONE, THREE, FOUR,
15                                    )   AND FIVE OF THE FIRST
                                      )   AMENDED COMPLAINT; AND (2)
16                                    )   UNSUPPORTED FACTUAL CLAIMS
                                      )   IN INTERVENOR/DEFENDANTS'
17   _____ )   MEMORANDA

18
                        TRANSCRIPT OF PROCEEDINGS
19            BEFORE THE HONORABLE BARRY M. KURREN,
                  UNITED STATES MAGISTRATE JUDGE
20
     APPEARANCES:
21
       For Plaintiffs          PAUL ALSTON, ESQ.
22     Syngenta Seeds, Inc. &  Alston Hunt Floyd & Ing
       Syngenta Hawaii, LLC:   1001 Bishop Street, Suite 1800
23                             Honolulu, Hawaii  96813

24

25
```

```
 1    APPEARANCES (Cont'd.):

 2    For Plaintiff BASF      KENNETH S. ROBBINS, ESQ.
      Plant Science, LP:      Alston Hunt Floyd & Ing
 3                            1001 Bishop Street, Suite 1800
                              Honolulu, Hawaii  96813
 4

 5
      For Plaintiffs          MARGERY S. BRONSTER, 4750
 6    Pioneer Hi-Bred         REX Y. FUJICHAKU, ESQ.
      International, Inc. &    Bronster Hoshibata
 7    Agrigenetics, Inc.:     1003 Bishop Street, Suite 2300
                              Honolulu, Hawaii 96813
 8

 9

10    For Defendant County    DAVID J. MINKIN, ESQ.
      of Kauai:               McCorriston Miller Mukai MacKinnon
11                            JESSE J. T. SMITH, ESQ.
                              TROY J. H. ANDRADE, ESQ.
12                            Five Waterfront Plaza, 4th Floor
                              500 Ala Moana Boulevard
13                            Honolulu, Hawaii  96813

14

15    For Intervenor-         PAUL H. ACHITOFF, ESQ.
      Defendants:             Earthjustice
16                            850 Richards Street, Suite 400
                              Honolulu, Hawaii  96813
17
                              GEORGE A. KIMBRELL, ESQ.
18                            SYLVIA SHIH-YAU WU, ESQ.
                              Center for Food Safety
19                            303 Sacramento St., 2nd Floor
                              San Francisco, California  94111
20

21
      Official Court          Cynthia Fazio, CSR, RMR, CRR
22    Reporter:               United States District Court
                              P.O. Box 50131
23                            Honolulu, Hawaii  96850

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

```
 1   WEDNESDAY, JULY 23, 2014                           1:01 P.M.
 2             THE LAW CLERK:  Civil Case 14-14BMK, Syngenta Seeds,
 3   Inc., et al., versus County of Kauai.  Hearing on various
 4   motions.
 5             Please make your appearances.
 6             MR. ALSTON:  Good morning -- good afternoon, Your
 7   Honor.  Paul Alston appearing for Syngenta plaintiffs.
 8             THE COURT:  Good afternoon.
 9             MR. ROBBINS:  Good afternoon, Your Honor.  Kenneth
10   Robbins appearing on behalf of BASF.
11             THE COURT:  Good afternoon.
12             MS. BRONSTER:  Good afternoon, Your Honor.  Margery
13   Bronster and Rex Fujichaku appearing on behalf of Agrigenetics
14   and Pioneer.  And representatives of the companies are all in
15   the courtroom.
16             THE COURT:  Good afternoon.
17             MR. MINKIN:  Good afternoon, Your Honor.  David
18   Minkin, Jesse Smith and Troy Andrade on behalf of the County of
19   Kauai.
20             THE COURT:  Good afternoon.
21             MR. ACHITOFF:  Good afternoon, Your Honor.  Paul
22   Achitoff, George Kimbrell and Sylvia Wu appearing on behalf of
23   intervenor defendants.
24             THE COURT:  Yes, good afternoon.  You ready to
25   proceed?
```

```
1              MR. ALSTON:  We are, Your Honor.

2              MR. ROBBINS:  We are.

3              THE COURT:  So who is up first?

4              MS. BRONSTER:  I think it's me.

5              THE COURT:  Okay.

6              MS. BRONSTER:  Good afternoon, Your Honor.

7              THE COURT:  Good afternoon.

8              MS. BRONSTER:  We're here today to talk about a lot of

9    different motions, but after we spoke last week, we're going to

10   focus on the authority question, the question of state

11   preemption and the questions related to federal preemption as

12   our primary issues.  There will be -- I will be taking up those

13   matters, and then others of my colleagues will touch on other

14   issues and certainly answer any questions you have on any of

15   the other issues that we'll be relying on the papers.

16             THE COURT:  Okay.

17             MS. BRONSTER:  The first question in looking at

18   whether or not a county ordinance is valid is something that

19   each and every one of the state preemption cases teaches us.

20   And that is, you must start by looking at whether or not the

21   County has authority to regulate in the area it purports to

22   regulate.  That is not strictly speaking a preemption question.

23   But you don't even get to the question of preemption if the

24   County doesn't have the authority to act.

25             And we learn this from a series of cases, whether it's
```

1    the Anamizu case or whether it's the Baptiste case, it starts

2    out with the proposition that the County may not act in any

3    area where it hasn't been given specific authority.

4         In Baptiste they talk about -- they call it the

5    allocation method.  And the reason why this is important and I

6    am spending a little time on it is because it's different from

7    the analysis that goes on between the federal government and

8    the state government.  Because the federal government and the

9    state government has a residual theory of power.  But under the

10   county law and all of the cases and the state Constitution, the

11   county only has those powers that it's given.

12        So if we start with the Constitution, the question is

13   whether the Constitution gives the county the specific

14   authority to regulate in the area of agriculture and

15   pesticides.  Because there is no question that that's what this

16   bill is.  2491 is a bill that was purported to regulate in the

17   area of pesticides and GMOs.  While there's some discussion of

18   nuisance, this is not a nuisance bill.  There is some

19   discussion about general public trust, this is not a public

20   trust doctrine.  This is, as it is discussed, a bill to

21   regulate agriculture.

22        So when we look at the Constitution, the Constitution

23   in Article XI, Section 3 specifically tells us who is going to

24   be regulating agriculture, and it says the State shall conserve

25   and protect agricultural lands, promote diversified ag,

1    increase agricultural self-sufficiency, and assure the

2    availability of agriculturally suitable lands.

3          And when asked who is going to make that determination

4    as to how it's going to be done, the Constitution answers that

5    question as well.  It says that the legislature shall provide

6    standards and criteria to accomplish the foregoing.

7          Now, when I read --

8          THE COURT:  Let me ask you a question about this.

9          MS. BRONSTER:  Sure.

10         THE COURT:  So it's the absence of any reference to

11   the County that's critical to your analysis here that -- that

12   suggests that the State only has authority over agricultural

13   matters, correct?

14         MS. BRONSTER:  Well, that's part of it.  It's the lack

15   of any reference to the county in that portion.  Now, we

16   recognize that the County has mentioned in the second portion

17   of Article XI, Section 3, where it talks about the important

18   agricultural lands.  But that's not the issue before the Court.

19         THE COURT:  Okay.  Well, there are other provisions of

20   the Constitution that do not refer to the county, but yet, you

21   know, clearly the counties, you know, have authority over

22   matters that are covered.

23         So, for instance, Section 1, Article IX of the

24   Constitution, which relates to public health, provides that the

25   State shall provide for the protection and promotion of the

1   public health.

2          Does that mean or would that suggest that the

3   counties, you know, may not legislate over matters that concern

4   protecting and promoting the public health?

5          MS. BRONSTER:  Well, actually what you have to do,

6   Your Honor, is look at the provision that sets up counties.

7   And the statutes that set up counties.

8          If you look at the Constitution, in Article VI,

9   Section 8, I believe it is, what it says is that the counties

10  shall have whatever powers are given to them by the

11  legislature.

12         THE COURT:  Mm-hmm.

13         MS. BRONSTER:  So in the example that you gave, there

14  would be a specific provision in the legislation where the

15  legislature says, Okay, counties, you may legislate in this

16  area.  And --

17         THE COURT:  Well, there's no reference to that in this

18  particular section, so you're saying to harmonize this with

19  other sections of the Constitution.

20         MS. BRONSTER:  Right.  Basically, what the

21  Constitution allows, and this was created in the 1968 ConCon

22  when they gave the counties certain rights, what they said was

23  that the State is given the general rights to do the things

24  outlined in the Constitution.  But according to the

25  Constitution, the State may delegate certain of those powers

1    and duties.  And so the question is, whether or not the

2    legislature actually delegated those powers and duties to the

3    counties in certain of the legislative pronouncements.

4          So, in particular, 46-1.5 outlines the general powers

5    and limitations of the counties.  And it goes through a whole

6    laundry list.  But absent that, what Anamizu tells us, what

7    Richardson tells us, what all of the cases, Hurip tells us, all

8    of those cases say you need to look for where the authority

9    lies.  And if you find the authority, then you go through a

10   preemption analysis.

11         THE COURT:  What do you make of HRS 205-43, which

12   relates to important agricultural lands, and it speaks to state

13   and county agricultural policies, et cetera.  Land use plans,

14   ordinances and the like.

15         MS. BRONSTER:  Right.

16         THE COURT:  How does that fit into this analysis?

17         MS. BRONSTER:  Okay.  Basically, what the counties

18   have been given is certain zoning rights, and they also have

19   certain other rights and responsibilities.

20         THE COURT:  Well, this says "county agricultural

21   policies."  Doesn't talk about zoning in particular.

22         MS. BRONSTER:  Understood.  But if you look at -- let

23   me just grab that.

24         If you look at the 205 and you look at the important

25   agricultural land, because that's what that section is talking

1    about, that is the intent to -- going back to the Constitution,

2    the Constitution is not self-effectuating with respect to these

3    powers.

4              THE COURT:  Right.  Right.

5              MS. BRONSTER:  And so what 205 is intended to do, it's

6    intended to legislate the second sentence of Article XI,

7    Section 3.  Which says that the lands identified by the State

8    as important agricultural lands need to fulfill the purposes

9    above, meaning assuring the availability of agriculturally

10   suitable lands, and shall not be reclassified by the State or

11   rezoned by its political subdivisions.

12             So basically it's saying once the State identifies

13   certain lands as important agricultural lands, that puts an

14   additional limit on the County and to what they can do with

15   respect to those lands and how they are -- it's supposed to be

16   done.

17             But we do not suggest that the County does not have

18   the authority to zone and, in appropriate circumstances, make

19   zoning decisions with respect to agricultural lands.

20             THE COURT:  Right.

21             MS. BRONSTER:  But that's not what's going on here.

22   This is not a zoning ordinance.  If it were, it would fail for

23   a lot of other reasons, spot zoning, and we've cited some cases

24   along those lines.

25             So what they're intending to do here is not say what

1   you can do on land that -- on -- they're not trying to identify

2   land in the zoning aspect.  What they're trying to do is

3   specifically regulate what can be done on that land by people

4   who are using pesticides and people who are farming.  And not

5   surprisingly, they do not cite a single solitary statute which

6   says that they have the right to engage in regulation of

7   agriculture.

8          And so it is a combination of the lack of a reference

9   in Article XI, Section 3, and that is the most specific

10  provision that talks about agriculture.  So once you get beyond

11  the Constitution, you need to take a look throughout the

12  ordinances.  I mean, I'm sorry, throughout the Hawaii Revised

13  Statutes.  And there are a lot of places in Hawaii Revised

14  Statutes that talk about ag and who has the responsibility and

15  who gets to decide how people operate in the area of ag.

16         The very first one is the Board of Agriculture at

17  HRS 26-16.  And it basically sets up a Board of Agriculture

18  that is not supposed to deal with simply state issues but

19  issues throughout the entire state and within each county.  In

20  fact, the Board of Agriculture specifically has a reference for

21  having a member representative from each of the islands,

22  including the island of Kauai.

23         You then get into the Department of Ag.  Now,

24  interestingly, the Department of Ag in 141-1 sets out the

25  functions of the Department of Ag, and those functions are

1   absolutely and completely in the area that the County is
2   improperly trying to regulate.
3          For example, in 141-1(2), it says that the Department
4   of Ag is supposed to encourage and cooperate with the
5   Agricultural Extension Service and the Agricultural Experiment
6   Station at the University of Hawaii and all private persons and
7   organizations doing work of an experimental or educational
8   character.
9          And one of the things that the County has criticized
10  the plaintiffs for is that some of what they're doing is
11  research.  But that is specifically given -- that's a specific
12  power that's given to the Department of Ag.
13         Similarly, the Department of Ag is supposed to provide
14  buildings, grounds, apparatus, appurtenances, basically give
15  support for obtaining propagation, study and the distribution
16  of beneficial insects, growths, antidotes for the eradication
17  of insects, blights, scales injurious to vegetation of value,
18  et cetera.
19         And finally, Your Honor, in 141-1(b)(5) -- I'm sorry,
20  (8), it says the department is supposed to administer a program
21  of agricultural planning and development, and it goes on and
22  on, and it also is supposed to assist in research, evaluation,
23  development, enhancement and expansion of local agricultural
24  industries.
25         "In the foregoing, the Department of Agriculture shall

1    act to conserve and protect agricultural lands and irrigation

2    water systems, promote diversified agriculture, increase

3    agricultural self-sufficiency, and ensure the availability of

4    agriculturally suitable lands."

5         So that is the legislative enactment of the second

6    sentence of Article XI, Section 3.

7         So if there's a question, the legislature was supposed

8    to act and tell who within the state, who was supposed to have

9    what responsibilities.  They did so.

10        But the entire -- I'm reading some sections out of

11   141-1.  But 141-1 also tells the State and the people what to

12   do if there's a problem in certain areas.  If there is a

13   problem, it is the Department of Agriculture that is supposed

14   to deal with these issues.  For example, in 141-2, it says that

15   it is the Department of Ag who is supposed to adopt, amend and

16   repeal rules for certain specific areas, and one of them is to

17   make a determination in Sub 3 about the prohibition of

18   importation into the state, from any or all foreign countries

19   or from other parts of the United States, or the shipment from

20   one island to another, et cetera, et cetera, of any specific

21   article, substance or object or class of articles, substances

22   or objects, among those enumerated above in this section, which

23   are diseased or infested or likely to assist in the

24   transmission, dissemination of any insect or plant disease

25   injurious, harmful or detrimental, or likely to be injurious

1   harmful or detrimental to the agricultural, horticultural
2   industries of the state.
3          And the manner in which the agricultural production,
4   promotion and research activities may be undertaken should be
5   done also by the Department of Ag, this time after coordinating
6   with the Agribusiness Development Corporation.  The
7   Agribusiness Development Corporation, which is created under
8   163D, is another one of those entities that has members from
9   each of the counties and is supposed to come up with uniform
10  plans and promotions in order to effectuate the purposes of
11  Article XI, Section 3.
12         So it is these things that are the beginning of an
13  indication that not only is this something that is given
14  exclusively to the State, and not to the County, but it also
15  sets up a mechanism for dealing with the specific issues that
16  the counties seem concerned about.
17         And in the specific provisions on 149A, 149A is the
18  pesticides law.  149A does not have any reference to the
19  counties having any authority.  However, it does have reference
20  to the fact that the State is supposed to take care of issues
21  even if they are local.
22         And specifically 149A-22 says the Board of
23  Agriculture, again, shall have the authority to adopt rules as
24  necessary, consistent with Section 5(f) and 24(c) of FIFRA to
25  develop and implement state programs for registration of

1    pesticides for special local needs.  So it is not

2    distributed -- that is not a power that is distributed down to

3    the counties.

4           In addition, two other points in 149A that bear merit

5    or note.  One is that there is a specific provision for a

6    committee which is set up to deal with issues.  There is a

7    pesticides advisory group.  The pesticides advisory group has

8    members of the Board of Land and Natural Resources.  It also

9    has members from the community and a member from an

10   environmental group.  All who are supposed to deal with issues

11   that come up that may suggest that they should start changing

12   issues relating to pesticides.  Again --

13          THE COURT:  On the state level.

14          MS. BRONSTER:  Throughout the state.  I mean, there is

15   no agriculture done unless it's done in a county.  I mean the

16   county -- the state exists and it has -- it has counties

17   throughout.  So it's not as though you could have a state issue

18   and a county issue, and all the counties would be completely

19   outside of the state.  They aren't separate, Your Honor.

20          So if these issues are not given to the counties, and

21   they rely -- they remain in the State, and the State is the one

22   who's supposed to make sure that they are uniform throughout.

23   And this is much more like the Anamizu case, the Kauai

24   utilities case, than it is about like some of the other cases

25   that we'll get to in a moment.

1          The final issue on the pesticides law, Your Honor, is

2     in 2013 there wasn't an interest in having certain information

3     posted.  Publicly.

4          THE COURT:  Right.

5          MS. BRONSTER:  And this was going to be for all RUP

6     applicators, and it was going to be put on a website.  But two

7     things were important.  One was that it was going to be subject

8     to 92(f).  So there were confidentiality concerns and

9     considerations that were available to the people who were using

10    the pesticides.

11         Second, Your Honor, they did not make everything

12    available.  They said we are going to make only certain

13    information available.  But we want to take a look and see

14    whether there's more that we should be doing in this area.  And

15    so the legislature didn't say, County, go do more if you think

16    we're not doing enough.  They said to the Legislative Reference

17    Bureau, Go and do a 50-state survey and see what other states

18    are doing out there, and we'll look at this again.

19         What the County did when they didn't like what was

20    being posted, they told the plaintiffs, and only the

21    plaintiffs, that they had to post not only the information that

22    the State required, but far more and without any of the

23    protections that were afforded by state or federal law.

24         All of these things indicate that this was not

25    something that was left to the counties.

1    So we believe, Your Honor, that they don't get -- they

2    don't even have the authority to do this.  So what do they

3    argue?  They argue that instead of having specific authority,

4    they argue three things that give them the alleged authority to

5    do this, to act and enact 2490.

6    The first one is the public trust doctrine.  Outlined

7    in Article XI, Section 1.  But Article XI, Section 1, gives

8    both the State and the County public trust responsibilities.

9    To do their public trust duties within their area of authority.

10   It doesn't in and of itself give them more authority.  In fact,

11   if the County was the only one with public trust doctrines,

12   perhaps they could argue that they can shunt the State aside.

13   But that is inconsistent with the provision of the law, and

14   it's also inconsistent with longstanding Supreme Court

15   precedent in Kauai Utilities, in Richardson.  The general rule

16   re:  Functions of statewide concern is if the counties are not

17   given specific authority to take over the function, the

18   counties cannot thwart the State from performing the duties.

19   And in the Constitution and in the statute, Title 11 and

20   throughout, the State is given specific authority and the

21   counties are not.

22   The second argument that they use is that the police

23   powers somehow give them the authority.  But interestingly, the

24   police power is not a constitutionally derived power.  It is a

25   granted power.  It is an allocated power like any other.  And

1    the legislature was so concerned that the police power might

2    grow and try to be used far beyond where it ought to that even

3    within the police power itself, 46-1.5 Sub 3 -- 13, rather, it

4    says that the counties may protect health, life, property and

5    preserve order and security.

6         But it also warns within that same subsection that it

7    doesn't allow them to legislate on a subject where the

8    statute -- I'm sorry, where the State has already regulated,

9    where the statute does not disclose the intent to be uniform

10   and exclusive.  So even within that argument there is a safe

11   harbor to say, Counties, don't go too far.

12        But if you're weighing the general police power versus

13   the very specific power over pesticides over agriculture, I

14   believe that the authority and all of the indications and cases

15   would say that the specific would govern and prevent the State

16   from acting.

17        But assume you don't agree with that.  The next

18   question is, is it allowed?  And the Richardson case and its

19   progeny gives a very clear outline of how to make this

20   analysis.  And the analysis is that if there is something of

21   statewide concern, which we've already discussed, then the --

22   then the County may not act, and I think in Hurip, a case that

23   you're probably aware of, which turn --

24        THE COURT:  You know, having senior moments, it didn't

25   occur to me until I read it that I had anything to do with it.

1          MS. BRONSTER:  There you were.

2          THE COURT:  It was my last case in state court, and

3     that's probably why I forgot it.

4          MS. BRONSTER:  But in that case, Your Honor, you

5     looked at the legislative history where they said we're not

6     intending to usurp the power of the traditional county power

7     over these issues.  And that's something that's absolutely

8     missing here.

9          But in Hurip, what the Supreme Court said is that they

10    harmonize the Sherwin Williams, the Anamizu, all the other

11    cases, and they said municipal ordinance may be preempted if it

12    covers the same subject matter within a comprehensive state

13    statutory scheme showing expressed or implied intent to be

14    exclusive and uniform, or it conflicts with state law.  And

15    conflicting with state law is defined also in that case, also

16    in Richardson, to say that it conflicts if it duplicates,

17    contradicts or enters an area fully occupied by the general

18    law.  And we believe that it's clear here that -- that the

19    State did not intend to regulate.

20         What the County and the intervenor seem to suggest,

21    however, Your Honor, is that there has to be some explicit

22    provision saying, County, you may not act.  But that is not the

23    law in the state of Hawaii.  And it's not the law because you

24    don't have an automatic residuary right falling upon the

25    county.  Because if you did, then the State would have to say,

1    Nope, you can't go here, you can't go there, you can't go to

2    the other place.

3         But since we are an allocated state, they don't have

4    to find where the State says no; they have to find where the

5    State says yes.  And they simply have not come up with anything

6    that give them -- gives them those rights.

7         So then you get to the question as to whether or not

8    the police powers have ever been interpreted to go so far as

9    this.  And they seem to cite Mortier over and over and over,

10   which is a U.S. Supreme Court case, which only said that this

11   is an area that devolves to the states and that the states have

12   had the power to enact.

13        And then in that particular case in Wisconsin, the

14   county was delegated the state, but what that proposition is,

15   is that FIFRA in the area in that particular area didn't

16   preempt local legislation.

17        But when you look at Hawaii, FIFRA may leave it to the

18   State, and that's why we have the state pesticide law, but the

19   State doesn't in turn delegate it to the county, and without

20   that delegation they don't have power to act.

21        And finally, they argue that the public nuisance law

22   applies, but, again, that doesn't give them the right

23   considering the Right to Farm Act, which says that no court,

24   official, public servant, public employee, shall declare

25   farming operation a nuisance, and that's what they're

```
 1    attempting to do here, and that law is not limited to nuisance
 2    lawsuits because, otherwise, there would be no reason to have
 3    public officials.
 4           Our time is limited, and unless you have other
 5    questions about state preemption or authority, I would like to
 6    spend some time --
 7           THE COURT:  I have some questions about preemption, so
 8    are you going to talk about --
 9           MS. BRONSTER:  I was going to talk about federal
10    preemption.
11           THE COURT:  Okay, go ahead and do so.  I have some
12    questions about like the pesticide law.
13           MS. BRONSTER:  Uh-huh.  I can --
14           THE COURT:  And are you covering that as well or are
15    you --
16           MS. BRONSTER:  Yes.
17           THE COURT:  Well, so, you were talking a little bit
18    about Hurip.
19           MS. BRONSTER:  Mm-hmm.
20           THE COURT:  You know, in that case the Supreme Court
21    held that the state no-fault or insurance -- well, the no-fault
22    law was not so comprehensive that the counties, you know, could
23    not legislate with respect to rental vehicles and the like.
24           So why is -- what is qualitatively different about the
25    pesticide statute here as opposed to the no-fault insurance law
```

1    that was interpreted the other way both by me and by the

2    Supreme Court in Hurip?

3         MS. BRONSTER:  Well, I think as I said briefly before,

4    I think one of the critical issues was whether or not there was

5    a traditional application of -- of power which allowed the

6    counties to act in that area.  And here we don't have any

7    traditional area where the counties have gotten involved in

8    pesticides.

9         But more importantly, when the court passed the

10   no-fault law -- I mean, I'm sorry, the legislature passed the

11   no-fault law, the legislative history specifically said, We are

12   not intending to prevent further protection, further protection

13   by the counties.  And in particular, the County had a specific

14   law that you looked at, and you said, This is precisely the

15   kind of thing that the legislature was thinking when it said

16   we're not trying to get away from that.

17        So, what the -- what both, I think, the -- your court

18   and the Supreme Court said that that was a floor.  And that was

19   intended to be a floor, and the legislative history made it a

20   floor.

21        But when you look at the cases where there was no

22   preemption, you're looking at places where there were spaces,

23   where there was dual authority, and they were not covering the

24   same topics.

25        And as you go through the pesticides law -- and I went

1    through some provisions of it, but I didn't go through them

2    all, it's all there in 149A -- but it has a lot of information

3    about what -- who can -- who can use pesticides.  And it's very

4    clear that you are subject to following the labels.  You're

5    subject to FIFRA.  You're subject to -- there's a whole bunch

6    of limitations on what you cannot do.  You cannot misbrand the

7    pesticides.  You cannot act if you are not a registered RUP

8    applicator.  So there are a lot of provisions that show that it

9    is covering the waterfront.

10          So it is more akin to the Anamizu case where the State

11   had statewide regulations about contractors.  And the County

12   went and said, I just want to fill in, I want to make, you

13   know, it more protective.  And the Supreme Court in Anamizu

14   said, No, you cannot take your general power over building

15   codes and say we're going to make electrical contractors have a

16   different standard.

17          THE COURT:  Well, as applied to licensing, but the

18   court did say there is a role for counties with respect to

19   construction activity and the like, and they were not limiting

20   the counties --

21          MS. BRONSTER:  And in that particular -- and in that

22   particular case, they -- the Anamizu case -- court specifically

23   cited specific provisions that said, You, counties, have the

24   right to regulate building codes.

25          THE COURT:  Right.

1          MS. BRONSTER:  So that was a specific delegated

2     authority.

3          So then you look at something like Richardson.  And in

4     Richardson the case says in that case both the County and the

5     State had very clear authority to condemn.  146-14 --

6          THE COURT:  Right.

7          MS. BRONSTER:  -- gives both the right to condemn.  So

8     what they said was, okay, well, is there state preemption?  And

9     how the court determined it was they said, Well, we think that

10    the state law, since they both have the same power, the state

11    law deals with residential land, and the county law deals with

12    conversion of condos and apartments, and so they are not

13    overlapping, they're not in the same space.

14         THE COURT:  Of course, the dissent didn't see it that

15    way, so --

16         MS. BRONSTER:  Well, that's true.  That's true.

17    But -- but that was --

18         THE COURT:  Whoever has the final word, I guess

19    decides what it is.

20         MS. BRONSTER:  So -- but I think that the area -- I

21    think one of the things that's interesting is when you look

22    at -- at preemption law, when somebody like -- who has the

23    authority and the specific authority goes and makes judgment

24    calls as to how far to go, particularly in terms of the

25    posting, they made decisions on how far to go and they only

1   went so far.  And they said, We're not going further.  You have
2   to have the opportunity to -- to give that meaning.  And if you
3   allow the counties to simply jump in, you're not giving that
4   decision any meaning whatsoever.
5          I do want to spend a few minutes talking about federal
6   preemption and -- because I think that the -- both the County
7   and the intervenors somehow either misread or misinterpreted
8   what we had to say.  I want to be very clear that we have not
9   given up on our federal preemption arguments, we have not
10   waived or abandoned them, and we have not conceded that there
11   is no express preemptions -- that no express preemption
12   applies.
13          And the express preemption applies in two ways.
14          The first one is on the pesticide disclosure.  And
15   that is under FIFRA 136i-1(b).
16          THE COURT:  This is the public disclosure you're
17   talking about.
18          MS. BRONSTER:  Of the pesticide disclosure.
19          THE COURT:  Right, right, right.
20          MS. BRONSTER:  It is our position that 136i-1(b) is
21   both an express preemption of the state and local government's
22   ability to require disclosure.
23          THE COURT:  I see.
24          MS. BRONSTER:  And it is -- it conflicts with federal
25   law.

1          136i-1(b) says:  "In no case may a government agency
2     release data, including the location from which the data was
3     derived, that would directly or indirectly reveal the identity
4     of the producers."
5          It's our position, Your Honor, that this applies
6     because the RUP, the licensed RUP applicators, collect the
7     information, they provide it to the government, and the
8     government says no government agency can disclose it.
9          For some reason the County believes that they are not
10    subject to that or their rule, which does precisely what
11    136i-1(b) says cannot be done, which is to disclose this
12    information publicly, including location information, very
13    specific location information, and that information that
14    identifies the producers.  So if it's not conflicted, it
15    certain -- I'm sorry, if it's not expressly preempted, it
16    certainly conflicts.
17         Second, Your Honor, what the counties seem to say is
18    that Mortier or the New York State law makes that an untenable
19    argument.  The state court case that they cite was decided
20    before this provision was even put into the law, and Mortier
21    had nothing to do with this.
22         But I think the other issue that is really important
23    to focus on for a moment is federal preemption on the GMOs.
24         There's a lot discussed about the coordinated
25    framework.  I'm not going to repeat that here.  But

1    Section 7756(b)(1) specifically prohibits states or political

2    subdivisions from regulating the movement in interstate

3    commerce of any articles that are considered plant pests if the

4    secretary has legislated -- I'm sorry -- has issued a

5    regulation or order.

6         With respect to regulated articles, and all of the

7    companies in our declarations have asserted that they have

8    them, the secretary has issued a regulation, and 7701

9    specifically says, which is another -- a federal issue, the

10   feds have specifically said that they intend that this is to

11   cover interstate commerce.

12        So, the idea that the County can come up with a

13   regulation that is specifically intended to prevent GMOs from

14   being grown so that they can now come in and decide whether or

15   not neighbors can -- can grow nearby and give out the

16   information of this location, location information is expressly

17   preempted by 7756(b)(1).

18        But it goes further than that, Your Honor, because

19   when -- in this case there are two points where it goes

20   further.  One is that by disclosing the information, they are

21   disclosing information that the federal government, APHIS and

22   the State are required to keep confidential.  They have

23   specific rules and regulations, and you may have been reminded

24   about the fact that you dealt with this issue previously as to

25   whether specific disclosure information can be protected and

1    should be protected.

2           And the federal government recently, in February of

3    2014, looked at the question as to whether or not they should

4    make more information available about the location of

5    genetically modified organisms.

6           Last Friday, Your Honor, APHIS decided -- after public

7    comment, they decided not to change the rule and not make the

8    information more available.  And in part, they decided that

9    last Friday because they looked at the problems that disclosure

10   of specific information can have on destruction of crops and

11   vandalism.

12          And that was the issue that was looked at eight years

13   ago, and quite frankly -- by this court and by the Ninth

14   Circuit -- and said that that was a valid reason for keeping

15   location information confidential, and yet 2491 is an end run

16   attempt to get around the federal law on the nondisclosure of

17   the location of GM, on the exclusivity of federal government

18   and APHIS's responsibility under 7756(b)(1).  And this rule

19   making which said we're not going to go there.  We believe it

20   also implicates the state Trades Secrets Act, which we

21   discussed briefly.

22          But we believe that the idea of allowing the

23   government -- federal government to go through a rigorous

24   analysis under which they make a determination that at the end

25   of the day, once they've looked at a regulated article, they'd

1   make a determination that it is no more risky than conventional

2   crops.

3          And the very next day what the County is intending to

4   do is to say, No, we are not going to treat these the same as

5   conventional crops.  We are going to set them up the day that

6   they are deregulated for special treatment where you have to

7   disclose where you had them from the day you first had your

8   permit, and all the way it discloses the information and it

9   essentially is an attempt to render the government's decision

10  of deregulation moot.  That's not what we believe that the feds

11  intended and we believe it is thereby preempted.

12         I'm sure there's lots more that I could say about

13  these issues, but I do want to leave time both for rebuttal and

14  for my colleagues, unless you have any other questions in that

15  area.

16         THE COURT:  Well, going about 45 minutes.

17         MS. BRONSTER:  I know.

18         THE COURT:  So not a lot of time, but I don't have

19  further questions at this time.

20         MR. ALSTON:  Good afternoon, Your Honor.  Time -- the

21  remaining time is short.  I want to address a number of issues

22  that would be guided by two principles.

23         One is the issues that have the biggest impact.  That

24  is, the arguments that strike down the whole ordinance as

25  opposed to ones that deal with fragments of the ordinance.

1            And the other is that there are some issues you are of

2     course required to avoid if you can, and the federal

3     constitutional issues are ones that, you know, I think have

4     been fully briefed, and I won't touch on them except for very

5     lightly at the end, because I want to focus on the ones that

6     lead to striking the whole ordinance.

7            The first is the eleventh claim for relief, which

8     involves two claims that arise under the county charter.  One

9     is the one subject rule, and the other is the rule regarding

10    the delegation authority.

11           On the first, on the one subject rule, I will say only

12    one thing, and that is that the Schwab v. Ariyoshi case teaches

13    that there are two evils that that's designed to prevent.  One

14    is the evil of hodgepodge or logrolling legislation; and the

15    other is fraud.  That is, where people are led to believe from

16    a title that the bill relates to one subject when in fact it

17    relates to the other.

18           And here what we have is hodgepodge legislation.  It

19    may be true, as Mr. Achitoff argues, that GMO and pesticides

20    are related in one fashion, but he overlooks the fact that the

21    regulations of GMOs also covers animals, fish, cows, anything

22    that is genetically engineered in one way or another.  And that

23    sweeps in the kind of hodgepodge subject -- subject matter that

24    I think is forbidden by Schwab.

25           The second -- the second point about the delegation to

1   the office of economic development, I think that the opinion

2   rendered by the county attorney, the undisputed expert in

3   municipal law, the only lawyer who will appear -- who won't

4   appear before you, but the only lawyer in this matter who has

5   both long-time expertise and the responsibility to live with

6   this, tells us that we are right on this issue.  Tells the

7   Court that we are right on this issue.

8          THE COURT:  Not the best department to deal with these

9   things.

10         MR. ALSTON:  Indeed.  Indeed.  And so I think that,

11  you know, given that the charter requires the mayor's blessing

12  with respect to the allocation of authority, that the County

13  clearly went off the reservation in adopting that.

14         Now, the other side says that the council has

15  authority because they've got authority to regulate over

16  nuisances and so forth.  Well, they do have that authority.

17  But that authority and the allocation of responsibility within

18  the executive branch has to be managed in the way that the

19  county charter provides.  And so even if there were nothing

20  else wrong with 2491, the fact that they've allocated in this

21  way and that allocation is woven into the fabric of the bill in

22  a way that the charter violates -- the way that violates the

23  charter, excuse me, is wrong.

24         The next issue I'd like to address is the Sunshine Law

25  issue.  And I would suggest to you that their argument that any

1   discussion of the names of the nominees or the applicants is
2   confidential fails for two reasons.
3          First, their argument proves too much.  The provision
4   of the Sunshine Law says that they can go into executive
5   session when they are going to discuss matters of privacy.  If
6   by definition mentioning Sam or Susan or whoever else they
7   might be hiring creates a matter affecting privacy, then the
8   second part of that clause would not be necessary.  It would
9   just say, Whenever you're going to go talk about hiring anybody
10  for anything, you can do it in executive session.  But it talks
11  about matters affecting higher privacy, and we've laid out why
12  under state law privacy means something more than the names of
13  people.
14         And the -- and the -- OIP has agreed with that in one
15  of its opinions, 05 -- I'm sorry, 95 -- 96-5.  They said that
16  the names of people who had applied for jobs with a county
17  licensee or a contractor were not private.  So it's not just
18  names.  What the OIP has indicated is that you have to balance
19  the public interest versus privacy.  And in this context,
20  clearly the appointment of a substitute council member, which
21  is not the hiring of a substitute council member, involves much
22  greater public interest than hiring the third assistant bottle
23  washer at the county jail, and it involves such important
24  matters that I suggest it is akin to the appointment of a judge
25  where the OIP has said names get revealed.

1           Lastly, on that point I want to address one thing that
2    our opponents say, and that is that there may have been matters
3    discussed during the executive session such as the health of
4    some -- of one of the applicants.  We're not trying to get at
5    that sort of information.  What we're saying is they should
6    have revealed the names of the 18 applicants before they went
7    in, and the failure to do that violates the Sunshine Law.
8           The other claim we raise under state law relates to
9    the imposition of civil fines.  I won't mention that other than
10   to say there's no dispute that the ordinance lacks the
11   requirements of state law.  They say it can be satisfied by
12   regulations; we say it can't be.  We'll submit on the papers.
13          With respect to the constitutional arguments, and I'll
14   touch on those very briefly, the equal protection argument is
15   one where I think it is obvious that this bill from the
16   legislative history and the comments of the council members was
17   targeted at one thing, and that was impairing the operations of
18   the seed companies.  Over and over again you see references to
19   them -- to the council members saying, We don't want to hurt
20   the local farmers, we don't want to get the little farmers.  We
21   just want to get the seed companies.
22          And that's what they did, and they did it in ways that
23   are in fact irrational for all the reasons we've outlined in
24   our papers.
25          The -- the restrictions, put in context, are obviously

1    absurd.  Our clients collectively lease approximately 20 square

2    miles of land.  Applied to them, the trigger means that if they

3    applied just a teaspoon and a half of any one pesticide across

4    their property, they're restricted, while the neighbors next to

5    them, who may use the same products in gallons per acre, are

6    restricted.

7            In the same way it applies -- the trigger is apply --

8    is based on the use of a restricted use pesticide.  But what

9    they don't tell you is that there are in fact many, many active

10   ingredients, quote, pyrethoids being one, which are found in

11   both general use pesticides and restrictive use pesticides.

12   Exactly the same active ingredient that they condemn is in

13   both -- is in both, just in different formulations.

14           And so they have a trigger where if we apply 5 pounds

15   or 15 gallons of something with that active ingredient, we're

16   regulated.  If the neighbor applies an unrestricted general use

17   application of the same -- of the same active ingredient, they

18   are not regulated, regardless of how much, regardless of

19   whether they're doing it on the doorsteps of the hospital or

20   even inside someone's home.

21           And so what you have is a bill that is directed

22   clearly at a class of one for constitutional purposes and

23   targeted in an irrational way, both with respect to the

24   triggers and the impact on the companies that are affected.

25           And all that's laid out in great detail in our papers,

 1   and I won't go into it in any more detail.

 2            The last thing I want to address and quickly is our

 3   Motion to Strike.  When this -- there are two aspects to that

 4   motion, as you know.  One is the concise statement and the

 5   materials that --

 6            THE COURT:  I thought we were just going to decide

 7   this on the papers.

 8            MR. ALSTON:  That's fine, I'll leave it.

 9            THE COURT:  That's fine.

10            MR. ALSTON:  All right, Your Honor.

11            THE COURT:  I want to leave as much time as possible

12   for discussion.

13            MR. ALSTON:  Thank you, Your Honor.  That's all,

14   unless you have questions.

15            THE COURT:  No, I don't have further questions.

16            MR. MINKIN:  You want to give the court reporter a

17   break or --

18            THE COURT:  She doesn't need a break.

19            MR. MINKIN:  Trying to be kind to those ten digits.

20            Thank you, Your Honor.  I will be sharing my time with

21   the intervenors, so I'm going to go hopefully about 20 minutes

22   or so and reserve about seven or eight minutes or maybe

23   10 minutes.

24            THE COURT:  Sure.

25            MR. MINKIN:  Something very interesting because based

```
 1    on our conference call with the Court, we were focussing on
 2    certain issues, and then it became a question as to what should
 3    we do about all the other issues that out there that have been
 4    basically briefed, and briefed and briefed again for the Court.
 5          And I want to touch upon something that Mr. Alston
 6    brought up that was very interesting to me, because he talked
 7    about the Sunshine Law.  And the Sunshine Law doesn't get
 8    judicial applicants' names out to the general public.  What the
 9    Sunshine Law gets is that final list of six or eight, or
10    whatever it is, for that particular position.  So, he's
11    attempting to create something that doesn't exist, say that
12    it's that way, and Your Honor knows it from his own experience
13    not everybody's name gets out there for various reasons because
14    if certain law firms knew that their partners were applying for
15    judgeships because those names went out, and they didn't make
16    the final list, who knows what havoc would be from that
17    particular situation.
18          I'm going to jump around a little bit because there's
19    a lot of information that's out there.
20          But Ms. Bronster talked about that this ordinance is
21    targeted against the plaintiffs.  There is another entity,
22    Kauai Coffee, that is not a party to this litigation and is not
23    here in -- whatsoever, and is also, if this ordinance is
24    upheld, would be held accountable for the obligations under
25    this ordinance.
```

1              That's first off.

2              Let's talk about the other -- the other arguments that

3     are there that Mr. Alston started talking about.  I think we

4     fully briefed them, but what's clear is that Claim Number 2,

5     which doesn't even get addressed by plaintiffs in their

6     opposition, they cite to another opposition and say, Well, you

7     can use the same arguments for Claim Number 3 as to Claim

8     Number 2, they failed to address it whatsoever.  And Claim

9     Number 10, we believe that they've conceded that based upon

10    their own pleadings, and Claim Number 10 comes out.  So 2 and

11    10 from our position are gone.

12             THE COURT:  Remind me what they are.  Just tell me

13    what you're talking about.

14             MR. MINKIN:  Claim Number 2 is federal preemption of

15    use of RUPs --

16             THE COURT:  Oh.  Oh, yeah.

17             MR. MINKIN:  -- and worker protection standard.  And

18    Number 10 --

19             THE COURT:  Well, they incorporate their argument on

20    their motion -- on their motion, so that's kind of a --

21             MR. MINKIN:  Okay.

22             THE COURT:  Yeah.  But what's the other one?

23             MR. MINKIN:  And then Claim 10 is special legislation.

24             THE COURT:  Okay.

25             MR. MINKIN:  Because basically they talked about in

1    their complaint how it's going to impact the State, but by the

2    way, now the State is still going to be able to do what it's

3    going to do no matter what.

4         THE COURT:  Right.

5         MR. MINKIN:  And I just want to talk a little bit

6    about whether the State should be here, because we believe that

7    the State is a required party.  It has immunity.  It's not our

8    duty or burden to invite them to the party.  And merely because

9    Ms. Bronster sent a letter in June to the Attorney General

10   telling them that this litigation is going on doesn't mean that

11   absolves them of their responsibility or the Court from its

12   analysis as to whether in fact, based upon the allegations, the

13   State has a concern, because if you go to the very end of it,

14   they talk about, well, the State can file its own suit if it

15   wants to dealing with this ordinance because it's their land.

16        That's exactly the reason why they are a required and

17   necessary party because we, the County, could be subject to

18   various decisions by various lawsuits over the same ordinance.

19   And that's why, from our position, we believe that the State is

20   a required and necessary party, and because of its immunity, it

21   can't be brought into this matter without waiving that

22   immunity, and, therefore, the case should be dismissed in total

23   on that issue.

24        THE COURT:  Well, so summarize for me why they are a

25   necessary party.

1          MR. MINKIN:  I believe that they are a necessary party
2     because they own more than or almost 50 percent or a little
3     more than 50 percent of the land that's leased by the
4     plaintiffs.
5          The allegations are in the complaint that:  "The
6     ordinance interferes with the State's ownership rights,
7     including its ability to use and lease its land as it deems
8     fit, and interferes with the terms of the leases."
9          So based on the complaint, they're saying that the
10    State has an interest which needs to be protected, and this
11    Court by ruling, say, against the State, or on the side of the
12    County on the Motion to Dismiss, basically would say, State,
13    too bad, so sad, you can't do anything because your rights have
14    now been restricted by my decision, but you aren't a party to
15    this proceeding.
16         That's it in a nutshell.  I'm not going to go much
17    further on that.
18         THE COURT:  Okay.
19         MR. MINKIN:  Let's talk about Your Honor's case, his
20    last case as a state judge where you were sitting up in circuit
21    court.  Because what's interesting is, you explained your
22    ruling, and it ended up in a footnote number 4 that was quoted
23    at length.  And basically what was quoted:  "The most
24    significant in my judgment is whether the state statutory
25    scheme of a state no-fault law preempts the entire area here,

1   which would prohibit the City and County of Honolulu from

2   legislating specifically with respect to rental vehicles, and

3   it appears to me that the State has not preempted this area."

4          And then you, also in the footnote:  "I see no reason

5   when you examine all of the regulations and questions why the

6   City cannot afford greater protection, specifically with

7   respect to rental vehicles.  That in my view is not

8   specifically addressed by the State statute, and this is

9   actually a very interesting issue and I'm sure it's not going

10  to stop here and probably should be addressed by the Supreme

11  Court."

12         And that dovetails nicely, and I'm not going to

13  regurgitate our arguments on the certified question, but

14  literally there is nothing out there dealing with this, dealing

15  with the agricultural confines of the State, whether it

16  preempts, precludes, limits in any manner, shape or form.

17         I'm going to go to the first argument that

18  Ms. Bronster raised.  What authority does the County have to do

19  this?  Where is that -- what is that authority?  And the

20  authority basically starts in the Constitution, Article VIII,

21  Section 1, that states:  "Each political subdivision shall have

22  an exercise of such powers as shall be conferred under general

23  laws."

24         All right.  So how do we get there?  We get there

25  under HRS 46-1.5(13), which is the police power.  And the Court

1   knows what it says and it's well acquainted with it.  But

2   that's one of the ways.  How else do we get there?  We get

3   there under the public trust doctrine under Article XI,

4   Section 1, of the Hawaii Constitution.

5          And this goes to the question -- the first question

6   that the Court asked Ms. Bronster:  Tell me about it, because

7   Section 1 talks about the State and its political subdivisions.

8   But as this Court knows from the Kauai Springs case, that

9   Section 7, which is water resources, indicates that the State

10   has an obligation.  But the Hawaii Supreme Court recently said

11   that that obligation not only is the State's but it extends for

12   water resources to the counties.

13          So, Section 7, which doesn't mention the subdivisions

14   at all, the Supreme Court has weighed in and said it is the

15   responsibility not only of the State but of the counties,

16   because let's go back to Section 1, it is something that's

17   really important and it's paramount for not only for the State

18   but the counties.

19          And that's exactly what the agricultural lands, there

20   is nothing in Section 3 that says in the first part that the

21   State shall conserve and protect that references the counties.

22          So we would submit to Your Honor that under the

23   guidance of Kauai Springs -- granted, it's water resource --

24   but the reality is that it extends the public trust doctrine to

25   something that normally or at least in the Constitution was

1    only assigned or delegated to the State.

2            But let's talk further.  And then we have the public

3    nuisance under HRS 46-17.  So we have general laws following

4    the Constitution enacted by the legislature that gives the

5    counties the ability to do certain things under the rules and

6    laws assigned to them.

7            So what can they do?  They can protect, under

8    46-1.5(13), the health, life and property, and protect and

9    preserve the order and security of the county and its

10   inhabitants on any subject or matter not inconsistent with or

11   tending to defeat the intent of any state statute.

12           So is there a specific state statute that says you

13   can't do this?  No.  So what happens?  We now tend to look at,

14   well, what's the scheme, what's going on, at least at the state

15   level?  And Ms. Bronster cited you to a number of sections, a

16   number of statutes, but just like -- just like this Court

17   looked at in that Dollar Rent-a-Car case, what was being said,

18   how was it being said and what import was actually taking

19   place.

20           And that's exactly what this Court needs to focus on:

21   What is the County doing with the passage of this ordinance?

22   The County is attempting to protect its citizenry.  How is it

23   doing it?  It's doing it by attempting to have buffer zones and

24   notification.  Notification about the crops after the fact.

25                THE COURT:  And so, for instance, why doesn't this

1    really occupy an area that has already fully or arguably fully

2    occupied by the State with respect to pesticides in the

3    pesticides statutes?

4         MR. MINKIN:  I don't think that it is.  The State has

5    certain statutes --

6         THE COURT:  They have a comprehensive scheme, and as

7    the court said in the Citizens Utility case where there's an

8    overall scheme that reserves in a particular agency, the PUC in

9    that case, you know, here the Department of Agriculture, a very

10   established comprehensive scheme, you know, that's for the

11   State, not for the County.

12        And why is this different from -- why is -- you know,

13   these regulations that are directed toward pesticide use

14   disclosure and the like not really in the same way, and you

15   talk about the Hurip case, for instance.  There -- I mean one

16   difference that I can see is that there was specific

17   legislative history talking about the limitations with respect

18   to the State and the no-fault law and at least allowing the

19   counties still to have some authority concerning rental

20   vehicles.  We don't have any of that kind of legislative

21   history in the pesticide statute.

22        MR. MINKIN:  Right.

23        THE COURT:  So you can speak to that for a bit.

24        MR. MINKIN:  Just briefly, because I agree with Your

25   Honor, there is no legislative history.  There is no real case

1    law out there discussing what the agriculture sections of the
2    Constitution and the statutes really mean.  Which tie in again
3    with our certified question, because here's something that
4    really is now coming out of -- coming out that may impact years
5    and generations going down, and we haven't had the highest
6    court of the State of Hawaii opine on this whatsoever.
7              And given -- and given the situation, we don't believe
8    that you have statutes here and a statute here that it really
9    isn't a comprehensive scheme.  Because it's not a coordinated
10   issue, it doesn't deal -- it doesn't cover it, I don't -- we
11   don't believe as effectively as the plaintiffs want you to
12   believe.  We think that it's piecemeal legislation, it's
13   dealing with certain things, and it really doesn't get to
14   what's going on, what's taking place literally today, what's
15   going on in the communities today, and it doesn't affect --
16             THE COURT:  You know, when in 2000 -- last year when
17   the legislature considered some of the kinds of disclosures
18   that, you know, are involved here, doesn't that sort of
19   indicate, you know, by implication that -- that they considered
20   this a matter for the State to -- to address and deal with?
21             MR. MINKIN:  I think that it does.  But the reality is
22   we don't know how it's being affected, number one.  And number
23   two, how does that affect the whole issue of preemption for the
24   State of Hawaii?  Is that sufficient to literally preempt what
25   the County has done in this situation, which again ties into

```
 1    the certification question?  And I don't wish to belabor that.
 2              THE COURT:  Right.
 3              MR. MINKIN:  But it's something that --
 4              THE COURT:  No, I understand your point.
 5              MR. MINKIN:  -- as judge -- as Judge Ezra indicated,
 6    because that's how the Richardson case got to the Hawaii
 7    Supreme Court.
 8              THE COURT:  Right, right.
 9              MR. MINKIN:  It's either going to be from Judge Ezra's
10    original decision, so I'm either going to do it, or the Ninth
11    Circuit may do it later, and it's probably more expeditious to
12    do it now.  And I understand that --
13              THE COURT:  Well, there is a problem.  This law goes
14    into effect really in a -- in about a month or two.  And as you
15    know, the Supreme Court won't act in a month or two.  What do
16    you say about that?
17              MR. MINKIN:  We have agreed in the past to a
18    stipulation.  There are other mechanisms available to the
19    plaintiffs if they wish to do whatever they wish to do.  I'm
20    not going to tell them how to do their job.  And that's
21    something that the Court literally -- Your Honor, I would
22    respectfully submit that you're putting the cart before the
23    horse, because if you make the decision that you have to make,
24    then other things fall into place and everybody does what they
25    need to do.  And to say that I'm not going to --
```

1          THE COURT:  That's fair.  I understand.

2          MR. MINKIN:  We get back to what are the burdens and

3     what does -- what must be shown and what must be out there.

4          And basically under Richardson holds that a

5     legislative enactment, they're presumptively valid.  Right?

6     And should be an interpreted -- interpreted in a manner to give

7     them effect.  What does that mean?  That means you have various

8     components of the ordinance, and literally this Court has to do

9     a dissection of that ordinance to see if you can give effect to

10    some of it, all of it, and that -- and that unfortunately --

11         THE COURT:  Is there a presumption in your favor in

12    analyzing state preemption?  Because you argue that and you go

13    back to federal law.  Actually both you and the intervenors do.

14    So I mean it's not a matter of what is prohibited.  Isn't it

15    correct that it's a matter of what actually is permitted?

16         MR. MINKIN:  I believe that's true.

17         THE COURT:  Okay.  But, I mean, actually this is an

18    issue that I -- I'm very uncertain about, the burdens on

19    preemption issues.  So I don't know if you have any thoughts on

20    how you -- talking specifically -- federal preemption, very

21    clear, we know the standards are clear.  But there doesn't

22    appear to be any real discussion, even in the Richardson case,

23    as best I can see, about who carries what burden when you're

24    dealing with preemption issues.

25         MR. MINKIN:  I think for us the way that we look at it

1    based upon the Richardson case utilizing -- basically looking

2    at it and then going to base -- looking at federal law, I think

3    that the presumption is that the law is valid, and then this

4    Court has to basically go back, make a determination in a

5    manner to give it effect, and who has the burden?  Who has the

6    burden, right, to show --

7        THE COURT:  Well, it's really more a matter of

8    statutory construction at that point, I think.  Right?

9        MR. MINKIN:  Correct.  I want to talk about Mortier

10   for a little bit, because Mortier is a seminal case.  And

11   notwithstanding the fact that that section in FIFRA wasn't

12   there at the time in FIFRA, but it was there in another

13   statute, so it existed at the time as of 1990.

14       Mortier gives local municipalities the discretion and

15   the ability to enact certain legislation.  Plaintiffs ignored

16   Mortier at the outset.  Didn't acknowledge it whatsoever.  And

17   basically presented to this Court an unlevel playing field in

18   their favor.  We pointed it out, and they still ignore Mortier,

19   except for the fact saying, Well, that one section.

20       THE COURT:  So how is that case relevant to our

21   analysis in your judgment?

22       MR. MINKIN:  I think it's relevant because it goes to

23   the issue of whether the County has the ability to enact

24   ordinances touching on some of these areas, notwithstanding

25   federal law out there, notwithstanding state law.  That Mortier

 1    says the local municipality has the right to do this.  And
 2    that's exactly what we're dealing with --
 3         THE COURT:  Well, if they have the authority.  I mean
 4    it's really referring to state -- states and counties, because
 5    there are a number of counties and states all over the country
 6    that have a different, you know, structure than we have here.
 7    So...
 8         MR. MINKIN:  Right, and it gets us back to the
 9    authority, and we believe --
10         THE COURT:  Right.
11         MR. MINKIN:  -- that based upon the Constitution,
12    various sections and various statutes, police power nuisance
13    law, that the authority has been given from the State --
14         THE COURT:  Right.
15         MR. MINKIN:  -- to the County to do this.
16         I'm going to break at this point, turn it over to
17    Mr. Achitoff as well as save some time.
18         THE COURT:  Okay.  Thank you.
19         MR. ACHITOFF:  Good afternoon.
20         THE COURT:  Good afternoon.  Hard to sit there for so
21    long and have to wait to --
22         MR. ACHITOFF:  Yes.  Well, Your Honor, a good lawyer
23    can argue anything, and the plaintiffs have good lawyers, and
24    so they are in fact arguing anything.  But, unfortunately,
25    what's arguable -- unfortunately for the plaintiffs what's

1    arguable is not the standard here.  Lots of things are

2    arguable, lots of things are conceivable.  But plaintiffs

3    actually have a very heavy burden here.  And the plaintiffs

4    want to flip this burden by hauling in concepts about authority

5    that are a red herring.

6            This is about -- the issues here that -- about

7    preemption are really about preemption.  They're not about

8    authority because the authority is very clear.  The authority

9    in 46-1.5(13) where the State expressly granted the County the

10   power to protect health, life and property is all the authority

11   that the County needs.  Period.

12           THE COURT:  Well, except that the Supreme Court has

13   said in connection with different statutory schemes that's not

14   enough.

15           MR. ACHITOFF:  Well, in the Hurip case the court --

16   the Hawaii Supreme Court rejected the argument that the State

17   hadn't conferred --

18           THE COURT:  Right.

19           MR. ACHITOFF:  -- on Honolulu County the power to

20   regulate vehicle insurance, and the court pointed to this very

21   provision and said --

22           THE COURT:  Right.

23           MR. ACHITOFF:  -- the health, life and property

24   provision, there's your authority.  Now if that can cover that,

25   surely it can cover something that is far more directly related

```
 1   to health, life and property than insurance.
 2            THE COURT:  Okay.
 3            MR. ACHITOFF:  And with respect to constitutionality,
 4   I mean, in effect, the plaintiffs are arguing that they're
 5   looking at constitutional provisions and saying, you know,
 6   Article XI, Section 3; Article XI, Section 5, this gives the
 7   State exclusive authority.  They're effectively arguing that
 8   the Ordinance 960 is unconstitutional.  And they have a very
 9   heavy burden to prove unconstitutionality.  Unconstitutionality
10   has to be shown beyond a reasonable doubt.  It has to be clear,
11   manifest and unmistakable under the Mallon case, under the
12   SHOPO case.  It's a very difficult standard for the plaintiffs
13   to meet.
14            They haven't come close to meeting that.  Looking at
15   the actual constitutional provisions it's ludicrous to say that
16   a provision that simply says that the State shall conserve and
17   protect agricultural lands says what the plaintiffs want it to
18   say, which is the State and only the State can regulate in the
19   area of agriculture.  It doesn't say that.
20            Now, the plaintiffs want the standard to be, well,
21   unless you can point to a statute that specifically says the
22   counties may regulate in the area of pesticide regulation, they
23   can't.
24            THE COURT:  Tell me this.
25            MR. ACHITOFF:  That's not the law.
```

1          THE COURT:  Other than zoning, what other area of

2     agriculture do any of the counties regulate or legislate in?

3          MR. ACHITOFF:  If I'm not mistaken, the County

4     attached to its reply brief a number of ordinances that

5     counties have passed with respect to agricultural regulation.

6          And the key here, I think, in addition, the question

7     is not, you know, who has done it; the question is can they do

8     it.  And the fact is, the traditional -- the authority to

9     protect health and safety is a traditional matter of local

10    concern.  That's not just me saying that.  That was the State

11    of Hawaii saying that in its amicus brief in the Mortier case.

12         Hawaii went to the Supreme Court and said, We're here

13    to protect the rights of localities.  Not just the state,

14    because Mortier was about a local regulation.  To protect the

15    rights of localities.  To protect health and safety.

16         So plaintiffs pooh-pooh the health and safety, but the

17    State of Hawaii expressly took the position that that was

18    sufficient to allow local regulation of pesticides.  And in

19    fact, Mortier specifically concerned not just the ability of a

20    locality to provide -- to issue pesticide permits but is also

21    about notification.  And very similar to Ordinance 960's public

22    notice provisions, and the court said, Yes, the County can do

23    that.

24         So the State constitutionality standard is very steep.

25    The federal statute -- the federal standard for preemption, as

1    the Court has acknowledged, is also quite steep, clear and

2    manifest.

3          And under the state statute, county ordinance, you

4    know, as Mr. Minkin pointed out, legislative enactments are

5    presumptively valid.  That's the Richardson court and that

6    includes county enactments.  So they should be interpreted in

7    such a manner as to give them effect if that's possible.

8    That's what the Richardson course -- Richardson court said.

9          So, you know, the real key here is have the -- with

10   respect to state law, state statutory preemption, have the

11   plaintiffs demonstrated legislative intent that -- to have the

12   State exclusively regulate in the area of pesticides and in the

13   area that Ordinance 960 regulates.  They have to show something

14   to indicate legislative intent to be exclusive.  Or they have

15   to show an actual conflict.

16         THE COURT:  Okay.  There could be field preemption.

17         MR. ACHITOFF:  There could -- in theory, there could

18   be field preemption.  However --

19         THE COURT:  Look at the pesticide statute, you don't

20   think that's a comprehensive --

21         MR. ACHITOFF:  Absolutely.  First, let me say two

22   things about that.  To answer your question, absolutely not, it

23   is not comprehensive.  And I know this in part because what it

24   doesn't cover.

25         THE COURT:  Okay.

1          MR. ACHITOFF:  And because if you look at statutes in

2     other jurisdictions, they cover a lot more.

3          But in addition, being comprehensive is not enough.

4     In Hurip, if I'm not mistaken, the court, the Hawaii Supreme

5     Court said that the legislation, the state legislation was in

6     fact comprehensive and uniform throughout the state.  They said

7     the legislature clearly intended that the insurance law was

8     comprehensive and uniform throughout the state.  But it found

9     no preemption anyway, because there was not the legislative

10    intent to be exclusive.

11         THE COURT:  Right.

12         MR. ACHITOFF:  And in fact, the Richardson court

13    emphasized and the Hurip court reiterated, the critical

14    determination is whether the statutory scheme indicates a

15    legislative intention to be the exclusive legislation

16    applicable to the relevant subject matter.

17         It's impossible to say that the pesticide law, 149A,

18    is even comprehensive, let alone exclusive where there are no

19    provisions prohibiting or restricting buffer zones or even

20    providing for them or warning signs.  There are no provisions

21    declaring it unlawful that anything that Ordinance 960 makes --

22    declaring it lawful to do that which Ordinance 960 declares

23    unlawful.

24         The State could easily have done that.  They could

25    have said, You may spray up to the borders of waterways.  You

1   can spray up to the doorway of a hospital.  They could have

2   said that.  They didn't say anything like that.

3              There is no provision --

4              THE COURT:  Well, that's -- isn't that a separate

5   question?  I mean it's whether the statutory scheme is

6   established such that if there is a body to do exactly those

7   kinds of things they are talking about, should it not be the

8   Department of Agriculture pursuant to this particular law?

9   And -- and to add further to that, exactly that effort that was

10  made just last year to -- to consider some of those very

11  regulations.

12             MR. ACHITOFF:  The mere fact that the Department of

13  Agriculture has certain authority, and let's assume for the

14  sake of discussion, they have the authority to do everything

15  that Ordinance 960 does, that says nothing about whether the

16  County has the authority to do that.

17             The mere unused authority to do something does not

18  create preemption.  And that's clear in U.S. Supreme Court case

19  of Wyeth where the plaintiff argued that, you know, that we

20  can't supply this label -- *Wyeth versus Levine*, we can't supply

21  this label because the FDA, you know, had the authority to tell

22  us that the label wasn't any good.  And the court said, Sorry,

23  that doesn't create preemption, the mere fact that that might

24  have happened.  You have to show me evidence that that is in

25  fact what they would have done.

1          The mere fact that the Department of Agriculture has

2   authority is simply irrelevant to whether the County has

3   authority to do what the State expressly said the County can

4   do, which is protect its residents' life, health and property.

5          If I can move on to -- or let's just say distinguish

6   Anamizu, which plaintiffs rely on.  The difference here is

7   Anamizu, the State established qualifications for contractors'

8   licenses, and they basically said, If you do this, if you meet

9   these qualifications, you can practice your trade.

10         THE COURT:  Very specific.  I understand that point.

11         MR. ACHITOFF:  Yeah.  And the County added

12   qualifications and said, No, you can't; not here.

13         So they did prohibit what the State permitted.  They

14   said, You can't come here with your license.  There's nothing

15   like that in this situation.  Ordinance 960 doesn't tell the

16   plaintiffs or anybody else, You can't do business in Kauai

17   County.  It just says, You have to follow these disclosures and

18   you have to have buffer zones; otherwise, you know, you're

19   welcome here.  Which certainly is not interfering with their

20   ability to do business in the county.

21         Before I move on to federal preemption issues, if the

22   Court has any more questions on the State preemption, I can try

23   to respond.

24         THE COURT:  No, I think I'm fine now.

25         MR. ACHITOFF:  Okay.  On the Plant Protection Act, we

1    really have to read this against a background of the

2    plaintiffs' burden.  There is a very strong preemption against

3    -- presumption against federal preemption of state or local

4    law.  And the plaintiffs have the burden of showing that

5    Congress had a clear and manifest purpose to preempt.

6          Now -- and if the Court can interpret an express

7    preemption clause to not preempt the State or local law, it

8    must do so.  And that's under *Bates versus Dow Agrosciences*.

9          So if there's ambiguity here, plaintiffs lose.

10          If you look at the express preemption provision, it's

11   quite limited.  It requires that the plaintiffs show that the

12   ordinance regulates the movement in interstate commerce, first

13   of all.  Where's the movement in interstate commerce here?  It

14   doesn't say this covers anything that affects interstate

15   commerce.  It doesn't -- it doesn't say anything like that.  It

16   says very specifically "movement in interstate commerce," and

17   there's a reason for that.

18          The PPA is a quarantine statute.  And there's a long

19   history of prior legislation that evolved into the Plant

20   Protection Act, and that the idea is only the federal

21   government can order plant quarantines.

22          There is nothing like that in Ordinance 960.  The only

23   control that is being created by the ordinance is purely

24   intracounty.  It's not even intrastate, but even if it were, as

25   plaintiffs cited some federal register comments in one of their

 1    replies, the USDA's position confirms that the Plant Protection
 2    Act does not per se prohibit state regulation of intrastate
 3    movement of genetically engineered plants.
 4         So that's pretty clear.
 5         The second thing that has to be found in order for
 6    this to apply at all is it has to be to control a plant pest.
 7    Where's the plant pest here?  Are plaintiffs going to stipulate
 8    that they're growing plant pests?  I don't think so.  Has there
 9    been any finding that there is a plant pest at issue here?  I
10    haven't see one.
11         The third thing is, it has to be an order or
12    regulation from the Secretary issued to prevent the
13    dissemination of a plant pest.  Where is this order or
14    regulation?  Plaintiffs referred to it.  I haven't seen it.
15    There isn't such order or regulation that prevents the
16    dissemination of plant pests that plaintiffs are growing.
17         They have to show all three of these apply.  They
18    haven't shown one.
19         Moreover, experimental -- there are two types of
20    genetically engineered crops:  They're either experimental,
21    they haven't deregulated yet; or they have been deregulated.
22    If they have been deregulated, there is no federal  oversight
23    whatsoever, zero.  The federal government says, We have no role
24    here.  You can buy it at the gardening store if you want to.
25         Okay.  Clearly, they do not do that unless they find

1    that there is no plant pest.  Therefore, clearly this does not

2    apply because you have to have a plant pest for it to apply at

3    all.  If it's an experimental genetically engineered crop,

4    hasn't been deregulated yet, these plants aren't even in

5    commerce because they can't even be sold until they are

6    deregulated.  So, again, this does not apply to them.

7          Moreover, you know, in terms of implied preemption and

8    looking into regulations and so forth, under *Cipollone versus*

9    *Liggett* where there is an express preemption clause, this

10   implies that there is no implied preemption.  There is

11   certainly a strong presumption against it.  Here Congress said,

12   This is what we want to do, this is what we want to preempt.

13         And if they didn't provide the agency with the

14   authority to go beyond that, even if USDA wanted to, they

15   couldn't issue regulations that say, Oh, yeah, we're going to

16   preempt that too.  That would be beyond their statutory

17   authority.  I don't believe they have done that, but they

18   couldn't if they wanted to.

19         With respect to the disclosure amendment under state

20   law, the Court had some questions about.  First of all, the

21   plaintiffs haven't shown that Ordinance 960 requires disclosure

22   of any information that the State actually prohibits the County

23   from disclosing.  They have made general assertions, but they

24   haven't actually pointed to any particular information or

25   particular type of information that is prohibited from

1   disclosure.  There is the UIPA applicability in the law.

2          THE COURT:  Right.

3          MR. ACHITOFF:  UIPA doesn't actually prohibit the

4   State or the County from disclosing information.  It gives the

5   State the option not to do so.  It doesn't have to disclose it

6   if you ask for it under UIPA, but they're not prohibited from

7   disclosing it.

8          Moreover, neither Section 149A nor any of the

9   regulations actually require the submission of any information

10  to the Department of Agriculture.  So it's totally unclear

11  whether this amendment, what it -- what it even involves.  If

12  you call up the Department of Agriculture and say, So what

13  information are pesticide applicators required to provide to

14  you that could possibly be put on your website?  You'll get the

15  answer that I got when I called them up, they said, We don't

16  require anything to be submitted to us.

17         So, we don't have any idea what this law actually

18  covers.  The only even conceivably relevant regulation

19  allows -- requires applicators to keep certain records and make

20  them available if the department wants to look at them, but

21  there is no requirement of providing this information.

22         And in any event, the law only provides what the

23  Department of Agriculture intends to do.  If we happen to get

24  any information -- from how and where we'll get that, we have

25  no idea -- but if we happen to get it, we'll put it on our

1    website.  But that doesn't say anything about what the County's

2    authority is.

3         There's no evidence here of exclusivity.  There's

4    nothing here that says, you know, this is to be the entire

5    extent of any dissemination of this information.  We don't want

6    the counties to do it.  Or anything like that.  I think reading

7    into this from legislative history and what they could have

8    done but they didn't do is a very dicy approach to interpreting

9    a statute.

10        So, you know, there's nothing in here about posting

11   warnings.  There's nothing in here about -- that, you know,

12   basically even deals with the question.  So, you know, I really

13   think that there is -- there's no "there" there.

14        I'm not sure how much time I've got, but I would like

15   to save a little bit for the end.

16        THE COURT:  Sure.

17        MR. ACHITOFF:  So if I've used up 20 minutes, then

18   I'll sit down.

19        THE COURT:  Well, I've lost track, but I'll tell you

20   it's probably about time for a break.

21        MR. ACHITOFF:  Okay.

22        THE COURT:  So, let's --

23        MR. ACHITOFF:  Let's say 20 --

24        THE COURT:  You have two more minutes.

25        MR. ACHITOFF:  Oh, I have two more minutes.  Okay,

1      I'll spend two more minutes.

2              THE COURT:  I shouldn't have said that.  I had you

3      walking back to your seat fully compliant.  So, you know, it's

4      my fault.

5              MR. ACHITOFF:  I'm sorry.  But let me spend two more

6      minutes, and this is on the FIFRA preemption, Section 136i-1.

7              Now, this is all about the identity of individual

8      producers.  That's the only thing that's even mentioned here

9      that's even arguably covered.  Okay.  Plaintiffs made

10     references to location information, things like this.  This

11     doesn't cover that.  It's not about that.  It just says

12     "identity of individual producers."  That's it.  Is the

13     identity of the individual producers in this case a secret to

14     anybody?  They're the plaintiffs in the lawsuit.  So what are

15     they talking about?

16             In any event, the -- there is a strong presumption

17     against federal preemption unless the attempt to preempt is

18     clear and manifest -- and manifest.  Here, all this talks about

19     is that certain records at the request of an agency will be

20     provided, but they can't disclose certain information that they

21     get.  It doesn't say anything about what the County can and

22     cannot do.  It certainly doesn't suggest that a county cannot

23     or a state cannot independently require disclosure of

24     information.  In fact, the Mortier case, as I mentioned, was

25     involved.  A local law that required notification, very similar

1    to Ordinance 960, and that was decided after the adoption of

2    136i-1.

3         This FIFRA has its own authority of the State's

4    provision that says a state may regulate the sale or use of

5    pesticides in the state and doesn't preempt -- FIFRA doesn't

6    preempt it unless it's about labeling or packaging.  This is

7    not about labeling or packaging.  In fact, notifying the public

8    isn't labeling, according to the Second Circuit at least.

9         And, you know, there's an affirmative disclaimer in

10   the very section that plaintiffs rely on of preemptive intent.

11   136i-1(e) says:  "The requirements of this section shall not

12   affect provisions of other federal or state laws."  I don't

13   think it could be any clearer that it doesn't preempt.  Thanks.

14        THE COURT:  Okay.  Let's take a ten-minute recess.

15        (A recess was taken from 2:33 p.m. to 2:48 p.m.)

16        THE COURT:  Please be seated.

17        MR. ROBBINS:  Your Honor, I'm here to address the

18   issue everybody has been waiting for, and that's the issue of

19   jurisdiction.

20        THE COURT:  Okay.

21        MR. ROBBINS:  I can't imagine for a moment that you

22   would have any question about the fact that 1332, 1331, 1337

23   and 1343, individually or together, would not confer

24   jurisdiction upon the Court.  Plus, Your Honor, I can't imagine

25   for a moment that you would conclude --

1          THE COURT:  Mr. Robbins, hold on for a second.

2          MR. MINKIN:  I thought the way it was set up was

3     plaintiffs got to argue whatever they wished to do.  We then

4     came in and oppose, they get rebuttal, and then we get

5     surrebuttal.  This is something that wasn't covered at the

6     outset, and basically we submitted, I thought -- based on the

7     Court's inclination, we submitted it on the pleadings.

8          THE COURT:  Right.  Well --

9          MR. ROBBINS:  Mr. Minkin did mention jurisdiction and

10    they --

11         THE COURT:  I said you could divide up the time any

12    way you wanted to divide it up, but, you know, you don't really

13    have a lot of time left.  I did mention in our conference I

14    didn't think this was one of the issues that I needed a lot,

15    you know, of discussion about.  But --

16         MR. ROBBINS:  In which event, if you have no questions

17    on jurisdiction, Your Honor, I will sit down.

18         THE COURT:  I do not.  I think it's clear enough on

19    the papers.

20         MR. ROBBINS:  Okay.  Thank you.

21         THE COURT:  Okay.  So, Mr. Alston.

22         MR. ALSTON:  Thank you, Your Honor.  I want to address

23    three things.  First, the County and the intervenors would have

24    you believe that simply incanting the phrase "public trust"

25    gives them sort of free-ranging authority to do whatever the

1    County wants to do.  The fact is that Article XI, Section 1,

2    simply gives them the authority to and the obligation, frankly,

3    to protect the public trust resources within the scope of their

4    delegated authority.  The County's delegated authority.

5         And the Kauai Springs case demonstrates appropriately

6    how that can be done.  In Kauai Springs the county agency

7    looked at and required the applicant to look at whether it had

8    complied with the requirements of the Commission on Water

9    Resource Management addressed the PUC -- any potential PUC

10   concerns and things of that nature.  The Supreme Court did not

11   say that the public trust doctrine simply opened the door to

12   action by the County that -- without being constrained at all

13   by the requirements of Article VIII with respect to what it did

14   simply by saying public trust assets are involved.  That's one

15   point.

16        The second point is Mr. Minkin suggests that Claim 10,

17   which is the state land and special legislation claim, was

18   abandoned.  In fact, if you look at Docket Number 95, Page 38

19   to the end, addresses exactly that claim.  We addressed it only

20   there because it was one that they moved to dismiss, not one

21   that we ever sought summary judgment on.

22        And we explained there that, first, general law is one

23   that applies in all political subdivisions.  The County cannot

24   by definition pass a general law.

25        And, second, even if the County could pass a general

65

```
 1    law, that this is a law that applies to a, basically, class of
 2    one for the purposes of that constitutional provision.  And we
 3    didn't move for summary judgment on it because what the Supreme
 4    Court has taught us in the cases we cited is that -- is that
 5    you have to look at whether the -- whether it is probable that
 6    someone else will come into the class.  And we didn't think the
 7    issue of probability was one that could be resolved summarily
 8    before the Court.
 9            Last thing I want to address is the -- just briefly is
10    the equal protection argument.  The State equal protection
11    argument is analyzed differently than the federal one.   In
12    federal law, it's true that the government can come in and
13    argue almost any -- anything it conceive as a -- it can
14    conceive, excuse me, as the justification for legislation.
15            Under Silva and the Super Ferry case -- in fact, the
16    Supreme Court has twice rejected legislation on the basis that
17    there is not in the record evidence to justify a reasonable
18    basis for the government's action.  And we think that when you
19    are -- when you examine this record and the residue of what's
20    left after the -- you review our Motion to Strike, you'll find
21    that they simply cannot meet -- meet that.  You're left with
22    the situation where the nature of the -- where 2491 does not in
23    any rational way address the use of particular products, the
24    alleged risks they're trying to address, the intensity of the
25    use, or the location of the use.  It is simply designed to get
```

1    the plaintiffs.  Nothing more.

2           And in that respect, I'd ask you to review Judge

3    Mollway's decision in the HRPT properties case where there was

4    a state law that targeted one landowner, just the way this

5    ordinance targets these landowners.  Thank you.

6           THE COURT:  You have about 30 seconds.

7           MS. BRONSTER:  Okay.  In 30 seconds, Your Honor.  To

8    respond to questions that you asked.

9           THE COURT:  Yes.

10          MS. BRONSTER:  One, you asked about the -- the burden.

11   And I believe that the burden to establish authority is on the

12   County.  If and only if they establish the burden of a showing

13   that they have the authority to operate in this area, then it

14   is our burden to show the comprehensive scheme.  But I don't --

15   and the conflict which I think we've addressed, and I won't go

16   through it.  But I don't believe that they have established the

17   burden.  And the reason -- the case law that I rely on to show

18   that burden is essentially all of the cases leading up to

19   Richardson, Anamizu and the others.

20          With respect to Mortier, the amicus brief that was

21   submitted by the State of Hawaii and others did not say give

22   the authority to local government.  It said leave the authority

23   with the states.

24          And the Supreme Court in Mortier said:  "The more

25   plausible reading of FIFRA's authorization to the states leaves

1    the allocation of regulatory authority to the absolute

2    discretion of the states themselves."

3           We are in an allocation state.  They then have to

4    prove that that authority was further allocated to the County,

5    which they have not and cannot do.

6           With respect to Mr. Achitoff's argument that unused

7    authority doesn't mean preemption, and he cited to a federal

8    case.  First of all, the federal case doesn't apply.  It is not

9    our burden to show that we say that the counties can't do it;

10   it's their burden to show that the counties can.

11          And if you want to consider federal law, I would

12   suggest to you that Geier and Spritzma both support the idea

13   that there are times when federal -- when legislation does

14   indicate that it should stop and not go further.  That's what

15   we believe applies.

16          And finally, Your Honor, on the question of

17   certification.

18          THE COURT:  Yes.

19          MS. BRONSTER:  There has been some discussion that you

20   ought to certify this case to the Supreme Court.  But we would

21   submit that the question of preemption and how to analyze it

22   was certified in the Richardson case.  And so Richardson gave a

23   roadmap on how to analyze these cases.  Richardson and Hurip

24   thereafter, and other cases that followed.

25          So the idea is not that every case that presents a

 1   question that has not been previously addressed should be

 2   certified.  No, it's only if you lack the tools to see how the

 3   Supreme Court of the state would address these issues should

 4   you consider certification, and we think that they've already

 5   given you that roadmap.  If you apply that roadmap, as we've

 6   laid out in our papers and in our argument today, we believe

 7   that we will show that they lack the authority and that they

 8   are preempted.

 9        And finally, Your Honor, with respect to the issues of

10   federal law, Mr. Achitoff said that 136i does not say anything

11   about location.  136i says:  "In no case may a government

12   agency release data, including the location from which the data

13   was derived."

14        MR. ACHITOFF:  That would --

15        MS. BRONSTER:  Says "location."

16        And -- and finally, Your Honor, with respect to the --

17   the issues of PPA.  And the PPA, Your Honor, the law in the

18   introductory provision says that:  "All plant pests regulated

19   under this chapter are in or affect interstate commerce."  The

20   definitions then go on to say that a release into the

21   environment is interstate commerce.

22        So, we ask you to take a look at the specific

23   regulations -- I'm sorry, move and related terms, movement is a

24   release into the environment, and interstate commerce then

25   talks about any trade, traffic or commerce.

1          As we have said in our declarations, all of these

2    seeds end up getting distributed to other states or

3    internationally.  We believe that there's no question that the

4    regulated articles are in interstate commerce according to the

5    provisions as how APHIS interprets it and how the law

6    interprets it.

7          There are a lot of things that I think that

8    Mr. Achitoff pooh-poohed or suggested that simply don't apply.

9    We have stated that we have -- all plaintiffs have regulated

10   articles, regulated under the PPA in Kauai.  To suggest that

11   there are no -- there's no application whatsoever is simply

12   belied by the facts and by the law as set out in our papers.

13         And unless you have any other questions, I will

14   respect the time.  Thank you.

15         THE COURT:  No.

16         MR. MINKIN:  Thank you.  Let's talk about the tenth

17   claim.  The tenth claim reads:  "Violations of limits on power

18   to regulate use of Hawaii state land and enact special

19   legislation."

20         So what do we know?  We know that the ordinance is not

21   special legislation because the ordinance defines a real rather

22   than illusory class.  And the classification is rationally

23   related to the purpose of protecting the health and safety of

24   the residents of Kauai as well as its natural resources.  And

25   for authority for this, *Sierra Club versus Department of*

1    *Transportation.*

2              The classification is real and based upon the quantity

3    of RUP use.  The ordinance applies to all commercial ag

4    entities that purchased or used in excess of 5 pounds or

5    15 gallons of any single RUP during the prior year.

6              Class of one argument is rebutted by the fact that

7    there are five plaintiffs that brought this lawsuit, and one

8    other entity at this point in time that we know of that is not

9    a participant in this lawsuit.  An entity that has its roots

10   going back to Alexander & Baldwin, a local big five company,

11   not international agricultural pesticide companies.

12             The classification under the ordinance is reasonable

13   and rationally related to protecting the health and safety of

14   the residents and natural resources.  Recognize that pesticides

15   can cause harm to the environment and serious injury or illness

16   to humans.  *Kalamata Farms versus United Agri Products.*

17             Recognize GMOs cause significant harm.  *Center for*

18   *Food Safety versus Johanns.*

19             The first amended complaint acknowledges the

20   environmental and health risks arising from pesticides and

21   GMOs.  That's why there's significant regulation at all levels

22   of government.

23             Then as to tying in the tenth claim, by leasing its

24   lands, which I talked about before, they now say the leases

25   will be unaffected.  You can't have it one way in the

1    complaint, and then come before you in an opposition or a

2    reply, or whatever you want to call it, and say, Well, that's

3    not true.  It's either one or the other.  It's either it will

4    be affected or it won't be affected.  You can't have the Court

5    believe in the complaint that it will be affected, and then

6    come before and you say not.  So either it's dismissed based

7    upon these rationales and reasons or it's not.  And I think

8    given what they've put out to this Court at this point in time,

9    Claim 10 is gone.

10          The burden to establish authority.  This gets back to

11   what is the law.  Richardson, presumed valid.  Presumed valid.

12   That's what you start with, that presumption.  And then what

13   needs to be done and how it gets done.

14          Plaintiffs want this Court to focus on federal law and

15   to interpret state law and look at how it gets done or how

16   state preemption impacts.  Therein lies the problem.  Therein

17   lies the reason for certification.

18          It's not a situation where you have the roadmap -- you

19   have a roadmap, yes.  But you don't have a roadmap that deals

20   with the agricultural scheme that they claim is comprehensive.

21   You don't have a roadmap that deals with the pesticide law that

22   they say preempts the county ordinance; therefore, that's the

23   reason why.  Yes, there's a roadmap, there is something there,

24   and the cases that -- you know, each case gives a little bit

25   more clarity to how that roadmap is to be utilized by the trial

1    judges.  But in this particular case that roadmap doesn't tell

2    us what to do with the agricultural scheme, nor with the

3    pesticides law.

4           And let's talk about the Kauai Springs case, because I

5    am well acquainted with that case.  I argued it before the ICA

6    and got a 96-page decision.  I argued it on writ to the Hawaii

7    Supreme Court and got a 107-page decision.  And to those of

8    those -- to those lawyers in the audience that thought once

9    Steve Levinson left that we wouldn't have decisions that

10   approached a hundred pages, guess again; it's a new life, it's

11   a new world, and, yes, we have that situation.

12          But what did that tell us?  That case -- and, yes, it

13   dealt with water resources, but there were no specific tie-ups

14   with the water resources, just like there's no specific tie-ups

15   with agriculture in the Constitution.  But the State Supreme

16   Court in a 107-page decision that also had a concurring and

17   dissenting opinion of 13 pages said -- which said right result

18   but I would have done something else at the end of the day,

19   basically said it's incumbent upon the County to do something

20   that no one thought they had to do.

21          Look at things from a different perspective to

22   basically worry about your citizenry, and we believe the

23   authority is there under the police power, we believe the

24   authority is there under the nuisance law, and we believe the

25   authority is there under the public trust doctrine.

1          But at the end of the day, if the roadmap is unclear

2     to Your Honor, at least as far as the State issues, it should

3     be certified.

4          And I'll defer now to Mr. Achitoff.  Thank you.

5          THE COURT:  Thank you.

6          MR. ACHITOFF:  Just a couple of points in response to

7     plaintiffs' most recent argument.

8          Plaintiffs keep insisting that the County and

9     intervenors haven't shown that the counties have any authority

10    to do what they did.  They've said it over and over again.

11    Just to reiterate, 46-1.5(13) provides explicit authority to do

12    exactly what the County did.  And as I mentioned, in Hurip that

13    was sufficient to provide the County with the authority to

14    issue an insurance regulation.  It surely is enough authority

15    here.

16         Moreover, the plaintiffs mentioned the right-to-farm

17    law as an example of how expansive the State authority is, and

18    some -- it's never entirely clear what plaintiffs hope to make

19    out of that law, but they seem to imply that it suggested some

20    sort of preemptive attempt -- intent.  But even the

21    right-to-farm law, which, you know, we briefed extensively

22    before this Court, it expressly provides that it does not

23    impair the County's power to protect public health and safety,

24    even in the face of a nuisance.

25         So even if the right-to-farm law was about nuisance

1    legislation rather than nuisance lawsuits, which is in fact

2    clearly what it is designed to deal with, but even if it did go

3    beyond that, it specifically exempts the County's efforts to

4    protect health and safety.  So the health and safety power, the

5    police power is a very strong one, and it's easily enough to

6    support a regulation like this.  There's simply no basis in the

7    law for saying that unless you find a statute or a

8    constitutional provision that says you can regulate pesticides,

9    that the counties can't.  It's just not the law.

10          With respect to the Plant Protection Act, plaintiffs

11    mentioned that in the definitions there's a reference to some

12    of their products being in interstate commerce.

13          First of all, that's merely the Congress' way of

14    saying USDA has this power under the commerce clause.  That's

15    really what it's there for.  But, you know, more specifically,

16    that's not -- what the actual provision at issue says, the

17    express preemption clause says is that the -- what the states

18    and counties can't do is regulate the movement in interstate

19    commerce.  It doesn't say the states and counties cannot

20    regulate anything that is in interstate commerce.

21          And if they had wanted to say that, they could have,

22    but they said regulate the movement in interstate commerce,

23    and, you know, it -- and as USDA confirmed, this does not

24    prohibit intrastate movement, to the extent that there is any

25    regulation of intrastate movement, which I would say there

1    really isn't even that.  Simply saying that you have to observe

2    buffer zones and disclose certain information clearly does not

3    regulate movement in interstate commerce.

4           With respect to any alleged implied preemption under

5    the Plant Protection Act, they simply want to point out that,

6    if you look at plaintiffs' complaint, they never alleged

7    implied preemption.  We don't believe that there is implied

8    preemption.  We briefed it.  I won't go over it, but I believe

9    that, regardless, they never alleged it in their complaint.

10   They were very clear that their claim for relief under the

11   Plant Protection Act was based on express preemption.  They

12   said it time and again.

13          Thank you.

14          THE COURT:  Okay.  Thank you.

15          Well, you all have given me a great deal of

16   information to think about.  And I know this law takes effect

17   relatively soon.  So I will, you know, work hard to get rulings

18   out on the various motions as soon as possible.

19          Okay.  Take the matter under advisement.

20          (The proceedings concluded at 3:10 p.m.,

21   July 23, 2014.)

22

23

24

25

```
 1                COURT REPORTER'S CERTIFICATE

 2

 3          I, CYNTHIA FAZIO, Official Court Reporter, United

 4     States District Court, District of Hawaii, do hereby certify

 5     that pursuant to 28 U.S.C. §753 the foregoing pages is a

 6     complete, true, and correct transcript of the stenographically

 7     reported proceedings held in the above-entitled matter and that

 8     the transcript page format is in conformance with the

 9     regulations of the Judicial Conference of the United Stated.

10
            DATED at Honolulu, Hawaii, July 29, 2014.
11

12

13                          /s/ Cynthia Fazio
                      CYNTHIA FAZIO, CSR, RMR, CRR
14

15

16

17

18

19

20

21

22

23

24

25
```